162 So.2d 455

**CULPEPPER & STONE PLUMBING & HEATING CO. et al.**

v.

**Louise TURNER.**

**CULPEPPER & STONE PLUMBING & HEATING CO. et al.**

v.

**John M. TURNER.**

**6 Div. 727, 728.**

Supreme Court of Alabama.

March 19, 1964.

Mead, Norman & Fitzpatrick, Birmingham, for appellants.

Higgins, Windham, Perdue & Johnson, Birmingham, for appellees.

COLEMAN, Justice.

These are appeals by defendants from judgments for plaintiffs in each of two actions brought to recover for damages resulting from a motor vehicle collision. The two actions were tried together.

The plaintiff in one case sues for the injury to her own person. She is the wife of the plaintiff in the other case who sues for loss of his wife's services and society and for the expense of her treatment, for injury to his own person, and for damage to his truck.

The defendants are the same in each case. Plaintiff charges defendants with liability resulting from operation of a truck. The driver of defendants' truck is made a party defendant.

On jury verdicts, judgments were rendered, $8,000.00 for the wife and $5,000.00 for the husband, respectively. Defendants' motions for new trial were overruled.

Defendants say that the court erred in two particulars common to both cases: first, in refusing the affirmative charges to the jury, requested in writing by defendants, to those counts of the complaints which charged defendants' truck driver with wanton misconduct; and, second, in overruling those grounds of the motions for new trial in which defendants assert that the amounts of the verdicts were grossly excessive.

The vehicles of both parties are described as trucks, probably of the pick-up class. Both were traveling in the same direction on the right-hand lane of a four-lane highway which is one of the main arteries for traffic into and out of Birmingham. Plaintiff's truck was in front, with wife driving and husband riding beside her. Defendants' truck was immediately behind and following plaintiff's truck. There were numerous automobiles using this highway in both directions when the collision occurred.

Immediately before the collision, there was a long string of cars immediately in front of plaintiff's truck, over half a block. There were two lanes for use of traffic going in the direction in which plaintiff's and defendants' trucks were traveling. Plaintiff had been traveling in the right lane for half a block or a block or more previous to the collision. A Coca-Cola truck was stopped on the highway in front

of plaintiff. It was "right against the curb." Plaintiff did not have to turn to miss the Coca-Cola truck. Immediately before the accident, the car immediately in front of plaintiff, and several cars in front of that car, stopped. Plaintiff's truck stopped also, and was "stopped or practically stopped" when defendants' truck struck the rear of plaintiff's truck. The evidence for plaintiffs tends to show the foregoing facts.

The driver of defendants' truck testified as follows:

"Q All right, as you saw that Coca-Cola truck up there, can you tell me what, if anything, you noticed happen to the traffic going along in that direction near and past and beyond the Coca-Cola truck?

"A We began checking down. What I mean by that is going along there I was holding my foot on the accelerator maintaining a constant speed and what I call checking down, I took my foot off the accelerator and the other traffic up there was slowing down and looked like it was dropping back and I had to drop off my speed to maintain my distance.

"Q The traffic up ahead, did you see any of it stopping up in the roadway in the right lane either beside or beyond the Coca-Cola truck?

"A No, sir, they were moving.

"MR. PERDUE: We object to that as leading.

"THE COURT: Overrule.

"MR. PERDUE: We except.

"Q You may answer.

"A We were all traveling, as I say, on the righthand section of the roadway and naturally we gave ourselves clearance on either side and when we got up where the Coca-Cola truck was we were moving over a little bit to go through here (indicating) and they were slowing down and going on through.

"Q Did you see any traffic stop near or beyond the Coca-Cola truck?

"A No, sir.

"Q Did you see any traffic that was backed up from any point between the Coca-Cola truck and on up towards that traffic light?

"A No, sir, not at that moment. Not at that time.

"Q I am talking about before the accident occurred?

"A No, sir.

"Q As you approached the Coca-Cola truck or as Mrs. Turner approached the Coca-Cola truck, will you describe what, if anything, she did in regard to her speed and her operation of her pickup truck?

"A She slowed down too like everybody else.

" . . . . . . . . . . .

"Q Will you describe to us as you and Mrs. Turner approached the Coca-Cola truck, what you did and what she did immediately before the accident happened and leading up to the moment of the accident? Describe what happened.

"A As I was coming into the—coming in following this truck ahead of me, I noticed the Coca-Cola truck on my right and we were veering over a little bit to get clearance to get through there, and I turned to look back this way (indicating) and looked to see if I was clear, I was still on my side and I saw the traffic was not going to plow into me and I would have clearance on this side (indicating), then I noticed Mrs. Turner stopped and I slammed on

"Q my brakes and slid up into the truck.

"Q Before you looked or glanced back to see about the traffic on your left, can you tell us approximately how far you were behind her automobile?

"A I guess about 20 feet.

"Q Can you tell me at that time what approximate speed the two of you were making?

"A I don't know whether I understand that.

"Q Immediately before you glanced back and as you pulled up there, can you tell us your approximate speed and her approximate speed?

"A I was making about 20 miles an hour, I suppose. That is the way it seemed to me. About 20 miles an hour and Mrs. Turner I presume to be making the same speed because we were—I was maintaining my distance.

"Q Then, can you tell me at that point where you glanced back, where the front end of her pickup truck was in regard to the rear end of the Coca-Cola truck?

"A About three feet behind it.

" . . . . . . . . . . .

"Q At that time you put on your brakes?

"A Yes, sir.

"Q Did you put them on gradually or easy or slam them on?

"A I slammed them on.

"Q Did you have good brakes on that truck?

"A Yes, sir.

"Q Did they respond?

"A Yes, sir.

"Q Did they slow you down to any extent?

"A I slid all the way in.

"Q Do you have any opinion of the speed you were making when you came in contact with the rear end of the pickup?

"A I imagine about ten miles an hour. That is just an estimate. Five or ten miles an hour.

"Q Will you tell me, please, when the collision took place, whether the pickup trucks went forward any from where the accident took place?

"A Mine anchored and theirs went forward about three feet or a yard.

" . . . . . . . . . . .

"Q Let me ask you this: Did you see any skid marks about your truck?

"A Yes, sir.

"Q Did you see Officer Hammett measure them there?

"A Yes, sir.

"Q After you moved your truck?

"A Yes, sir.

"Q Can you tell us how many feet of skid marks were sticking out the back end of your truck where it stopped?

"A Looked like about six feet.

" . . . . . . . . . . .

"Q In other words, so the jury can know what we are talking about, as you approached that truck you turned around to look back over your left shoulder in this lane (indicating) to see what was coming by?

"A Yes, sir.

"Q Was the traffic coming by?

"A Yes, sir.

"Q Were you looking back to .see, Mr. Stone, if you could turn out into that lane?

"A No, sir.

"Q But you were looking at the traffic in that lane?

"A The reason we do—if you will let me tell you I will tell what the situation is. On a pickup truck just behind the driver there is a place where there is a blind spot. If you drive a pickup much you know there is a blind spot and an automobile can hide in that part, what I call the side, and if you move over you will run them into someone else and I knew I was going to have to move over to go behind her, to trail in behind and I looked back to see if I was clear or if traffic was okay for me to go over and not run anybody over.

"Q And you found it wasn't clear?

"A It was clear for me to go over enough and when I looked back, with the speed I was going and the speed of the cars in the other lane it was clear for me to go on provided the traffic moving like we were moving would go on through. I had that much clearance.

"Q Here is what I am trying to get at, Mr. Stone.
"When you got along here somewhere (indicating), back of that truck with the traffic slowing down, you looked back over your lefthand shoulder?

"A Yes, sir.

"Q And when you turned back around and looked back to the front this lady was sitting there in that pickup truck perfectly still?

"A Just—the tires just about quit rolling when I turned back. They just about quit rolling and I slammed on my brakes.

"Q What actually happened is that she stopped while you were looking back?

"A I don't know whether she stopped while I was looking back. She was still in motion.

"Q Let me ask you if she wasn't going forward 15 or 20 miles an hour when you looked at her before you looked back?

"A She was going forward when I looked back.

"Q And then you looked back?

"A Yes, sir, I turned back like. that (indicating).

"Q And when you looked back to the front again she was either at the stop or practically stopped?

"A Yes, sir.

"Q So that she either stopped or practically stopped while you were looking back over your lefthand shoulder?

"A Yes, sir."

The question is: Does the evidence support a finding that the driver of defendants' truck was guilty of wanton conduct in causing the collision?

In considering the question of the sufficiency of the evidence of wantonness to be submitted to the jury, this court must accept the adduced evidence most favorable to the plaintiff as true, and indulge such reasonable inferences as the jury was free to draw from the evidence. English v. Jacobs, 263 Ala. 376, 377, 82 So.2d 542, 543; McNickle v. Stripling, 259 Ala. 576, 67 So.2d 832. Where from

the evidence a reasonable inference may be drawn adverse to party requesting affirmative charge, the charge is properly refused. Aircraft Sales & Service v. Gantt, 255 Ala. 508, 52 So.2d 388.

In wantonness, the party doing the act, or failing to act, is conscious of his conduct, and, without having the intent to injure, is conscious, from his knowledge of existing circumstances and conditions, that his conduct . will likely or probably result in injury. Birmingham Railway & Electric Co. v. Bowers, 110 Ala. 328, 20 So. 345.

 Wantonness is a conscious doing of some act or omission of some duty under knowledge of existing conditions and conscious that from the doing of such act or omission of such duty injury will likely or probably result. First National Bank of Dothan v. Sanders, 227 Ala. 313, 149 So. 848; Schuler v. Nelson Weaver Companies, 270 Ala. 727, 121 So.2d 908.

"The mental state of the person who did or omitted to do that which duty required in the premises (Sington v. Birmingham Ry., Lt. & P. Co., supra [200 Ala. 282, 76 So. 48]), is the matter of controlling importance in cases of this character. . . ." Law v. Saks, 241 Ala. 37, 38, 1 So.2d 28.

By his own testimony, the driver of defendants' truck had full knowledge of the position of plaintiff's truck, the surrounding circumstances, and of the fact that as plaintiff's truck was approaching the Coca-Cola truck, "She slowed down too like everybody else." Apparently he looked around to his left and omitted to keep a lookout ahead at the critical time when plaintiff's truck came to a stop because other vehicles in front of plaintiff had also stopped. Defendants' driver, on again looking ahead, slammed on his brakes, skidded six feet, but was not able to stop before defendants' truck ran into the rear of plaintiff's truck and knocked it "forward about three feet or a yard."

 Whether the action of defendants' driver resulted from mere inadvertence or inattention, which would be nothing more than negligence; or whether the driver's action resulted from a conscious indifference to the likely or probable consequences, which would be wantonness, was a question for the jury. We are of opinion that the court did not err in refusing defendants' requested affirmative charges as to the wanton counts.

The injuries to the person of the husband were comparatively minor. He noticed some soreness in his chest, went to the doctor three times, and had some X-rays taken, at a cost of $28.00. Repairs to plaintiff's truck cost $25.34.

The injuries to the wife were more severe. There are tendencies of the evidence to effect that all of the wife's suffering, in her back, did not result from the collision, and that some of her suffering resulted from conditions which existed prior to the collision. We do not understand, however, that defendants insist that the evidence does not support a finding that her injuries and suffering, which we set out below, did result from the collision.

 There is evidence that, at the time of the trial, the wife still had a "ruptured disc in the small of her back that most likely had undergone some degeneration," that she was wearing a metal and leather brace to splint or brace the lower part of her back, that she had been to the doctor thirty-seven times, that she had spent four days in the hospital, that she actually needed a major operation on her back, that such an operation is successful in 85 to 95 per cent of such cases, that if the result is good she will have 15 to 20 per cent permanent partial disability within six months to a year after the operation, that she has a greater disability without the operation, and that she would be hospitalized two weeks for the operation. She would be completely disabled two or three months after the operation and then partially disabled. She has a chronic condition now. We are of opinion that $8,000.00

for the injury to the wife's person is not so excessive as to show bias, mistake, corruption or prejudice on the part of the jury.

For medical treatment for himself and wife and repairs to truck, the husband has already sustained expenses amounting to $551.11. The operation which the wife needs will require hospitalization, which will cost "several hundred dollars," and surgical fees, which will "average five or six hundred dollars for the two" surgeons required to perform the operation.

The accident occurred two years and eight months prior to the trial. On the trial the husband testified:

"Q Has she complained to you since the automobile accident on April 2, 1958?

"A Yes, sir.

"Q How often?

"A Very often. Nearly everyday. She has some spells worse than others and sometimes she feels better than other times. Some days are worse."

 The rule which governs review of the action of a trial court in overruling a motion for new trial on the ground that the verdict is excessive is well understood. The practical application of this rule by appellate courts to verdicts challenged for this alleged vice is a matter of great difficulty as well as delicacy. Central of Georgia Railway Co. v. White, 175 Ala. 60, 62, 56 So. 574. The trial court refused to disturb the amount of the verdict and the presumption attending the verdict is thereby strengthened. When such is the case, the appellate court is very reluctant to substitute its judgment for that of the jury and court below unless the amount is so excessive as to indicate passion, prejudice, corruption, or mistake on the part of the jury. Liberty National Life Insurance Company v. Weldon, 267 Ala. 171, 100 So. 2d 696, 61 A.L.R.2d 1346; Airheart v. Green, 267 Ala. 689, 104 So.2d 687.

In view of the expense to the husband resulting from the accident and the loss of consortium and services of his wife due to her disabled condition, we are not persuaded that we should substitute our judgment for that of the jury which brought in the verdict for the husband or for that of the trial court who presided at the trial and refused to reduce the award on the motion for new trial.

Affirmed.

LIVINGSTON, C. J., and LAWSON and GOODWYN, JJ., concur.