[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 240 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 241 
Bama Budweiser of Montgomery, Inc., owned by Frank Schilleci, sued Anheuser-Busch, Inc.; Horn Beverage Company, Inc., an Alabama corporation; Bill Horn, individually and as owner of Horn Beverage; Capital City Beverage Company, Inc. ("CCB"), an Alabama corporation; and Nelson Daniel, sole owner and former president of CCB, alleging fraud and various torts and violations of certain statutes governing the business relations between wholesalers and suppliers of beer. After the defendants answered the complaint and extensive discovery was completed, Schilleci amended his complaint to further allege breach of contract, conversion, and the "tort of outrageous conduct." All of the defendants moved for a summary judgment on the various counts against them, and the motions were granted. The court's judgments did not dispose of all aspects of the case, but the court certified them as final under Rule 54(b), A.R.Civ.P. Bama Budweiser appealed.
We begin our review by noting the following undisputed facts: CCB, a licensed beer wholesaler of Anheuser-Busch products for approximately 23 years, was dissolved in December 1988. It began as a partnership between Paul Daniel and his father; it consisted of Capital City Beverage Company of Selma, Inc. ("CCB Selma"); Capital City Beverage Company of Troy, Inc. ("CCB Troy"); and Capital City Beverage Company of Montgomery, Inc. *Page 242 
("CCB Montgomery").[1] Each of these three businesses was licensed to sell the Anheuser-Busch products in certain specified areas of the state.
Prior to 1982, anti-trust laws prohibited Anheuser-Busch from granting exclusive territories to its wholesalers, so it merely assigned different areas of "primary responsibility." CCB Troy's geographic area was described by a map attached to the agreement; it included Bullock, Covington, Crenshaw, and Pike Counties. The map attached to the CCB Montgomery agreement defined its area as the counties of Autauga, Elmore, and Montgomery. Although CCB Troy was not assigned any portion of Montgomery County, it nonetheless sold Anheuser-Busch products out of its Troy warehouse to 23 retailers located in south Montgomery County along and between U.S. Highways 331 and 231. CCB Montgomery sold Anheuser-Busch products in these areas only on rare occasions. Because both wholesale companies were owned by Daniel and his father, it made no economic difference to them as to which company serviced Montgomery County.
In 1982, Horn Beverage acquired the assets of CCB Troy and sought to replace the company as the authorized seller of Anheuser-Busch products in that area. Bill Horn and Daniel had an unwritten informal agreement allowing Horn Beverage to make sales of Anheuser-Busch products in the south Montgomery area; Anheuser-Busch was not aware of this agreement. Anheuser-Busch approved the transfer and issued a change of ownership form describing the sales area of CCB Troy as "all of the counties of Pike, Bullock, Covington, and Crenshaw located within the State of Alabama." CCB Troy was dissolved, and Anheuser-Busch then executed a wholesaler agreement assigning those four counties to Horn Beverage. The agreement contained no authorization for sales in the southern portions of Montgomery County; however, Horn continued to service the same 23 accounts in south Montgomery that CCB Troy had always serviced. CCB Montgomery never serviced any of these accounts after Horn's purchase of CCB Troy's assets in 1982.
In late 1982, Anheuser-Busch revised its wholesaler agreements throughout the United States and, pursuant to changes in anti-trust laws, designated exclusive sales territories for individual wholesalers. Anheuser-Busch sent new wholesaler agreement forms to Horn Beverage and CCB Montgomery and instructed them to review the documents for accuracy and to furnish some additional information. With the new agreements, Anheuser-Busch assigned to the two wholesalers the same counties they had had under their previous agreements with the company. Horn Beverage was granted no authorization to service south Montgomery County, the area specifically assigned to CCB Montgomery. Horn and Daniel signed the documents on behalf of their respective companies and returned them to Anheuser-Busch for final approval.
In 1987, Schilleci approached Daniel about the possibility of purchasing CCB Selma and CCB Montgomery. At the time, Schilleci owned two other wholesale beer distributorships in Alabama. During the negotiations that ensued, Daniel provided financial and sales records to Schilleci and his representatives so that they could evaluate the business prior to the closing. All of these evaluations were based on the assets of CCB Montgomery and not the territory it serviced; thus, the 23 south Montgomery accounts were not factored into the business's estimated worth. Based on this information, Schilleci's advisors valued CCB Montgomery and CCB Selma from $3 million to $5.5 million. Schilleci subsequently offered Daniel $5 million for the businesses, which he accepted, contingent upon Anheuser-Busch's approval of Schilleci as a wholesaler. To gain Anheuser-Busch's approval, Schilleci was required to 1) demonstrate his financial ability to assume the business, 2) gain clearance from Anheuser-Busch's legal department, and 3) submit a five-year marketing plan. Schilleci sent Anheuser-Busch the documentation necessary for approval and *Page 243 
thereafter awaited word of Anheuser-Busch's decision.
Sometime after June 1988, Horn learned that Daniel planned to sell CCB Troy and CCB Montgomery to Schilleci. Daniel informed Horn that Schilleci was having trouble getting approval from Anheuser-Busch and advised Horn to work the problem out with Schilleci if he was ultimately approved.
In September 1988, Horn told Schilleci at a wholesaler's meeting that Horn Beverage had been selling Anheuser-Busch products in the south Montgomery area for years and that he wanted to continue to do so after Schilleci acquired CCB Montgomery. Because he had not yet been approved by Anheuser-Busch to replace Daniel as its authorized wholesaler in the south Montgomery area, Schilleci made no commitment to Horn at that time. Soon thereafter, Anheuser-Busch officially refused to approve Schilleci as an assignee of Daniel's wholesale equity agreement, because his five-year marketing plan was inadequate; however, Anheuser-Busch did give Schilleci permission to submit a second plan.
During this time, Horn contacted two Anheuser-Busch sales officials and told them he had been selling Anheuser-Busch products in the south Montgomery area for many years and that he wished to continue selling in that area. The Anheuser-Busch district sales manager then initiated an investigation of the matter.
In November 1988, Schilleci submitted a second, more comprehensive marketing plan to Anheuser-Busch. At the same time, Daniel executed a second notice of intent to sell CCB Montgomery and CCB Selma to Schilleci, pending Anheuser-Busch's approval.
As part of the renewed approval process, two Anheuser-Busch representatives arranged a meeting with Schilleci on December 8, 1988. Prior to the meeting, the representatives prepared a written agenda that included the recommendation that Horn be allowed to continue servicing these accounts. At the meeting, however, Anheuser-Busch representatives told Schilleci that he would be expected to work all the accounts in Montgomery County and never discussed Horn's servicing of the 23 south Montgomery accounts. Schilleci was apprised of other requirements as a condition to approval, and he agreed to those terms.
Thereafter, Schilleci received a letter from Anheuser-Busch accepting him as a transferee of Daniel's wholesale beer distributorships. On December 30, 1988, the parties met to close the sale of CCB Montgomery and CCB Selma. In accordance with Anheuser-Busch's instructions, the parties executed a "Wholesaler Equity Assignment Document" and a "Supplemental Agreement," which expressly stated that Schilleci would "service the territory currently being serviced" by CCB Montgomery. The assignment of CCB Montgomery's agreement contained a map showing that company's territory, including all of Montgomery County.
Following the transfer of CCB Montgomery to Schilleci, Horn continued to service the 23 south Montgomery accounts. In March 1989, Schilleci confronted Daniel regarding Horn Beverage's activities, and Daniel told him for the first time about the unofficial agreement he had with Horn to allow Horn Beverage to service south Montgomery County. Schilleci thereafter sent a letter to Horn warning him to cease from these sales, but Horn continued. Schilleci then sent a letter to Anheuser-Busch requesting a resolution of this problem.
After discussions with its general counsel, Anheuser-Busch sent a copy of the memorandum recommending that Horn Beverage be allowed to continue selling Anheuser-Busch products in the south Montgomery area. In June 1989, Anheuser-Busch sent a registered letter to Schilleci and Horn notifying them that Anheuser-Busch was formally altering the territory of Horn Beverage to include the 23 south Montgomery accounts and including revised maps reflecting this official change. Schilleci subsequently initiated this action.
Schilleci argues that the trial court erred in entering the summary judgments for the defendants on several individual *Page 244 
counts. We therefore begin our review by recognizing that a summary judgment is proper and must be affirmed on appeal if, viewing the evidence in the light most favorable to the nonmoving party, the appellate court concludes that there was no genuine issue of material fact and that the moving party was entitled to a judgment as a matter of law. Lowe v. East EndMemorial Hospital Health Centers, 477 So.2d 339 (Ala. 1985).
 Fraudulent Misrepresentation
Schilleci first argues that the trial court erred in entering a summary judgment for Anheuser-Busch on the issue of fraudulent misrepresentation. He points out that Anheuser-Busch representatives informed him during an Atlanta meeting that he would be required to service all of the accounts in the Montgomery County area if he was approved by Anheuser-Busch. Schilleci alleges that this representation induced him to purchase CCB Montgomery and CCB Selma for $5 million and that he would have paid $1 million less if he had known that the south Montgomery accounts would not be included in this territory.
The elements of fraudulent misrepresentation are (1) misrepresentation of a material fact (2) made willfully to deceive or recklessly without knowledge (3) which was justifiably relied upon by the plaintiff under the circumstances and (4) which caused damage as a proximate consequence. Harrington v. Johnson Rast Hays, Inc.,577 So.2d 437 (Ala. 1991). A "material fact" is a fact of such a nature as to induce action on the part of the complaining party. Bank ofRed Bay v. King, 482 So.2d 274 (Ala. 1985).
A representation that causes a person to do nothing more than he was already contractually obligated to do before the representation was made is not material and therefore cannot support a fraud action. Reeves v. Porter, 521 So.2d 963
(Ala. 1988). In its order, the trial court held that the representations Anheuser-Busch made to Schilleci in the Atlanta meeting were not material, because he was already contractually bound to purchase CCB Montgomery for $5 million before the meeting took place.
In June 1988, Schilleci first contracted with Daniel to purchase CCB Selma/Montgomery for $5 million, pending approval from Anheuser-Busch. It is undisputed that Schilleci's offer was based on the recommendation of an expert that he had hired to evaluate the worth of CCB Montgomery and that the expert's computation of the business's worth did not include the value of the south Montgomery territory. Schilleci re-executed the same agreement in September 1988 to reflect a minor change in language. The document was drafted by his attorney, who referred to it as a "binding contract." Within the next two months, while Anheuser-Busch was considering whether to approve the proposed transfer, the sales manager for CCB Montgomery told Schilleci that Horn was servicing South Montgomery and that he had been doing so for many years. In September, Horn himself told Schilleci at a wholesaler's meeting that he had been servicing these accounts for years and that he wanted to continue doing so even if Schilleci was approved by Anheuser-Busch as a wholesaler and was then able to purchase CCB Montgomery.
When Schilleci was rejected by Anheuser-Busch because of the inadequate market plan, he was unable to carry out the purchase of CCB Montgomery. Thereafter, Schilleci began the approval process again by submitting a second, improved marketing plan and re-executing the same $5 million contract with Daniel, even though he knew that Horn was servicing the 23 south Montgomery accounts. He did not attempt to reduce the price from the $5 million he had previously agreed to pay for CCB Montgomery and CCB Troy. Schilleci testified in deposition that he wanted to consummate the purchase at that time, even though he knew that the south Montgomery accounts had been exclusively serviced by Horn since 1982.
Schilleci points out that each of these contracts was specifically conditioned *Page 245 
upon Anheuser-Busch's approval of Schilleci as a wholesaler, and he argues that the agreements were merely executory until December 22, 1988, when Anheuser-Busch officially approved him. This Court has long recognized that when a party cannot perform a contract without obtaining the consent of a third person who is free to withhold it, such consent is a condition precedent to performance of the contract. Olen Real Estate InvestmentCo. v. Zieman Co., 269 Ala. 106, 110 So.2d 890 (1959). Such a requirement of consent does not, however, affect the validity
of the contract to convey, when the terms of the contract are otherwise complete and nothing is left for future negotiation.Olen, supra. Here, the contract between Daniel and Schilleci contained no incomplete terms or uncertainties; rather, it was a fully negotiated, signed agreement with no barrier to performance other than the consent of Anheuser-Busch. Because Schilleci was, thus, contractually bound to purchase CCB from Daniel for $5 million prior to the December 8 meeting, the statements of the Anheuser-Busch agents, as a matter of law, could not have induced Schilleci to purchase CCB for $5 million. Accordingly, the trial court properly entered the summary judgment for Anheuser-Busch as to this issue.
 Fraud by Silence
Schilleci next argues that Daniel and CCB Montgomery committed fraud by silence by failing to disclose a February 1988 market report that revealed that Anheuser-Busch was dissatisfied with CCB Montgomery's facilities. In this report, Anheuser-Busch cited specific problems with the wholesale operation and directed CCB Montgomery to make expensive renovations in its equipment and operation to meet Anheuser-Busch standards. Schilleci alleges that he would have paid $1.5 million less for the business if he had known of Anheuser-Busch's dissatisfaction with the operation and the expense that would be involved in making the changes required.
In its order, the trial court held that there was no material issue of fact as to whether Schilleci knew of the market report during negotiations for CCB Montgomery. The court noted that in deposition Schilleci testified that he had read the negative market report from Anheuser-Busch regarding CCB Montgomery before purchasing the business and had used the information contained therein to formulate his second market plan for Anheuser-Busch after the first one was rejected. However, in his affidavit opposing the summary judgment motion on this issue, Schilleci said that the document he saw was merely the general cover letter of the report, which did not greatly detail the problems Anheuser-Busch had with CCB Montgomery. Schilleci's attorney also gave an affidavit in which he stated that neither he nor Schilleci saw the full report during the negotiations to buy CCB Montgomery.
When a party to an action has, in response to unambiguous questions, given clear answers that negate the existence of any genuine issue of fact, that party cannot later create an issue of fact by submitting an affidavit that directly contradicts, without explanation, that earlier testimony. Tittle v. AlabamaPower Co., 570 So.2d 601 (Ala. 1990). In this case, Schillecihas offered an explanation for the contradictions in his deposition testimony and his affidavit. Further, the record indicates that Daniel did not give Schilleci the report until after the closing, when he left a copy of it behind after cleaning out his desk at CCB Montgomery.
The fact that Schilleci may not have seen the full market report before closing the sale does not, however, establish his claim of fraud by silence. The elements of this claim are 1) a duty to disclose the facts, 2) concealment or nondisclosure of material facts by the defendant, 3) inducement of the plaintiff to act, and 4) action by the plaintiff to his injury.Wilson v. Brown 496 So.2d 756 (Ala. 1986). Silence is not actionable unless there is a confidential relationship or some special circumstance that imposes a duty to disclose. Wilson, supra. Whether there is a duty to speak depends upon the fiduciary, or other, relationship of the parties, the value of the *Page 246 
particular fact, the relative knowledge of the parties, and other circumstances of the case. Ala. Code. 1975, § 6-5-102. When the parties to a transaction deal with each other at arm's length, with no confidential relationship, no obligation to disclose arises when information is not requested. Norman v.Amoco Oil Co., 558 So.2d 903 (Ala. 1990).
Here, Schilleci has not established the existence of special circumstances or a confidential relationship between himself and Daniel that would give rise to a duty to disclose the market report. Both men were experienced wholesalers and were dealing at arm's length over the purchase of a business with which each was familiar. Schilleci admits that he had, at the very least, a copy of the market report's cover letter and that he had even used the information contained therein to bolster the second market plan he submitted for Anheuser-Busch's approval. The letter clearly indicated that CCB Montgomery had failed to meet Anheuser-Busch's standards of quality in several areas, but Schilleci did not choose to ask Daniel for more information or otherwise to investigate the matter. These circumstances did not impose on Daniel any duty to provide Schilleci with more information. Although it did so for different reasons, the trial court properly entered a summary judgment for Daniel on this issue. A correct decision will not be disturbed even if the court gives a wrong reason.Davison v. Lowery, 526 So.2d 2 (Ala. 1988), cert. denied,488 U.S. 854, 109 S.Ct. 140, 102 L.Ed.2d 113 (1988).
Schilleci also argues that Anheuser-Busch committed fraud by silence by failing to provide him with a copy of the adverse market report. This argument is without merit. Anheuser-Busch was in no way involved in the negotiation process with Daniel and Schilleci for the purchase of CCB Montgomery. In fact, Anheuser-Busch was not notified of Daniel's intent to sell the business until two weeks after Schilleci had made his $5 million offer to Daniel. Because Anheuser-Busch had no duty to disclose the market report to Schilleci, the summary judgment was properly entered in its favor on this issue.
Schilleci next contends that Daniel and CCB Montgomery committed fraud by silence in failing to disclose the fact that Horn Beverage was selling Anheuser-Busch products in south Montgomery and the fact that Horn and Daniel had an unwritten agreement authorizing Horn to do so. However, it is undisputed that, during the period of negotiation with Daniel, at least two individuals informed Schilleci that the 23 accounts were being serviced by Horn. Schilleci testified in deposition that he never discussed the south Montgomery accounts with Daniel before the closing of the deal and that he did not question Daniel about these accounts after learning that Horn serviced them. Instead, Schilleci continued to vigorously seek Anheuser-Busch's approval of the transfer. It is undisputed that Schilleci has been in the beer distributing business since 1972 and is experienced in this area. He was represented throughout the entire negotiation process by his attorneys and accountants, as well as experts who evaluated the worth of CCB Montgomery and CCB Selma as being in excess of $5 million, even without the value of the 23 south Montgomery accounts. In view of the foregoing, we conclude that Schilleci did not present sufficient evidence to establish the necessary elements of fraudulent suppression. Accordingly, the trial court properly entered the summary judgment on this claim.
 Tortious Interference
The next issue presented is whether the trial court erred in entering a summary judgment for Anheuser-Busch on the issue of tortious interference with Schilleci's contract with Daniel. Schilleci argues that Anheuser-Busch unreasonably delayed the transfer of CCB Montgomery's assets by initially rejecting Schilleci as a purchaser and by officially adding the 23 south Montgomery accounts to Horn's territory.
The elements of this cause of action are 1) the existence of a contract or business relation, 2) the defendant's knowledge *Page 247 
of the contract or business relation, 3) intentional interference by the defendant with the contract or business, and 4) damage to the plaintiff as a result of the defendant's interference. Century 21 Academy Realty, Inc. v. Breland,571 So.2d 296 (Ala. 1990).
A party to a particular contract cannot, as a matter of law, be liable for tortious interference with that contract.Lolley v. Howell, 504 So.2d 253 (Ala. 1987). In its order, the trial court determined that Anheuser-Busch was a party to the contract between Daniel and Schilleci. The court recognized that the transfer of CCB Montgomery's assets from Daniel to Schilleci required Anheuser-Busch's approval, without which the transfer could not be completed. Absent Anheuser-Busch's consent and affiliation, neither Schilleci nor Daniel could market or sell Anheuser-Busch products. Moreover, the equity agreement between Anheuser-Busch and CCB that was assigned to Schilleci contains the following provision regarding the transfer of a wholesale beer distributorship: "No action taken by Anheuser-Busch and no failure of it to act, under any terms of the agreement, shall give rise to a claim against Anheuser-Busch by any proposed purchaser." By accepting the assignment of this agreement, Schilleci bound himself to its terms, and he is, thus, now barred from asserting such a claim. Therefore, the summary judgment on this issue was appropriately entered in favor of Anheuser-Busch.
Schilleci next argues that the trial court erred in entering a summary judgment on his claim against Horn and Horn Beverage alleging tortious interference with CCB Montgomery's business. Schilleci bases his claim on Horn's failure to stop working the accounts after CCB Montgomery was transferred to Schilleci. However, bona fide business competition is a justification for intentional interference with a competitor's business; even when such competition is carried out to the extent of ruining a rival, it is a justifiable interference in another's business relations and is not actionable. Dunnivant v. Bi-State AutoParts, 851 F.2d 1575 (11th Cir. 1988). Here, it is undisputed that Horn had serviced the 23 accounts for years before Schilleci's purchase of CCB Montgomery and that, afterwards, he merely continued to do what he had always done to secure profit. From the evidence, the trial court correctly concluded that Horn acted only for the sake of legitimate business purposes; thus, it properly entered the summary judgment in favor of Horn Beverage.
 Alleged Violation of Alabama Acts 84-374 and 88-80
Schilleci next challenges the trial court's summary judgment for Anheuser-Busch, Daniel, and CCB Montgomery on claims arising from Ala. Code 1975, § 28-8-1 et seq., as amended (Act 84-374), and § 28-9-6 et seq. (Act 88-80) (collectively referred to as "Territorial Acts"). The Territorial Acts require that a beer supplier designate exclusive sales territories within the state and name one licensed wholesaler for each territory. Sales by a wholesaler are unlawful unless made in the wholesaler's designated territory and authorized by a written agreement with the supplier, § 28-8-8, and the territories may be altered or modified only if the supplier 1) gives 60 days' notice of its intended action, 2) acts in good faith, and 3) demonstrates good cause for the amendment.
Schilleci stresses that the maps and narrative descriptions of the exclusive territory assigned to CCB Montgomery by Anheuser-Busch in 1982 included all of Montgomery County and in no way delineated the south Montgomery area as the territory of Horn Beverage. Schilleci thus argues that he was assigned the exclusive right to service the south Montgomery area and that Anheuser-Busch modified this territory without complying with the statute. He further argues that this modification constitutes a breach of Daniel's contract with Anheuser-Busch, which was assigned to him after the purchase of CCB Montgomery.
In its order, the trial court held that Anheuser-Busch's change in the maps and *Page 248 
description of the territory originally assigned to CCB Montgomery was not a modification of the territory, but rather a correction of the formal documents. The court further held that even if the change did constitute a modification of territory, Anheuser-Busch substantially complied with the statutory requirements.
In its letter to Horn and Daniel resolving the dispute over the accounts, Anheuser-Busch stated:
 "The purpose of this is not to modify your equity agreements in any way, but rather to correct a mistake that has existed since the time the new equity agreements were issued in 1982.
 "The mistakes centered on several accounts in the southern most part of Montgomery County. These accounts had always been serviced out of the Troy, Alabama, operation of Capital City Beverage until that operation was sold to Bill Horn in 1982. At that time Horn Beverage Company of Brundidge and that wholesaler continued to service the accounts.
 "At the time the new equity agreement was issued in December 1982, neither Horn Beverage Company nor Capital City Beverage pointed out the obvious error in the territorial descriptions. Nevertheless, Horn Beverage continued to service these accounts and services them to this day.
 "Our determination that these accounts have been, and should continue to be, part of the territory serviced by the Horn Beverage Company is the result of careful analysis of the historical situation, and the equities involved here."
It is undisputed that since its territorial maps and descriptions were issued in 1982, CCB Montgomery hasnever serviced the 23 south Montgomery accounts. On the day Daniel and Schilleci closed the sale of CCB Montgomery/Troy, Schilleci executed a "Supplemental Agreement" granting him the right to work accounts in the "territory currently serviced" by CCB Montgomery. Schilleci was fully aware when he signed the Supplemental Agreement that CCB Montgomery was not currently servicing the south Montgomery accounts and had not done so since 1982, when Horn left the employment of CCB Montgomery and established Horn Beverage. The trial court correctly held that Schilleci's rights to service any particular territory arose out of the assignment of Daniel's rights as reflected in the Supplemental Agreement.
Therefore, we hold that the change in territorial maps and descriptions did not constitute an amendment of the territory transferred from CCB Montgomery to Schilleci; rather, the changes merely updated the maps and descriptions to formally reflect the actual area that CCB Montgomery served. Accordingly, the requirements of the statute were never invoked, and Anheuser-Busch was entitled to a judgment as a matter of law on this issue. Moreover, because the changes made by Anheuser-Busch did not alter or modify the wholesaler's agreement, the trial court properly entered the summary judgment for Anheuser-Busch on the claim alleging breach of contract.
Schilleci next argues that Horn and Horn Beverage had violated the Territorial Acts by selling Anheuser-Busch products in the south Montgomery area since 1982. However, the Territorial Acts do not create a civil cause of action in favor of Schilleci against Horn and Horn Beverage. On the contrary, § 28-9-8(a) expressly provides that "[n]othing contained in this chapter shall give rise to a claim against the supplier or wholesaler by any proposed purchaser of wholesaler's business."
Where this Court is called upon to construe a statute, it is our duty to ascertain and effectuate the legislative intent expressed in the statute, which may be gleaned from the language used, the reason and necessity for the act, and the purpose sought to be obtained. Tuscaloosa County Comm'n v.Deputy Sheriffs' Ass'n of Tuscaloosa County, 589 So.2d 687
(Ala. 1991). Here, it is clear that the legislature intended to create no private cause of action between wholesalers, and this Court is not empowered to invade the legislative process and judicially create rights that the legislature clearly did not intend to create. *Page 249 Tuscaloosa County Comm'n, supra. We therefore conclude that the trial court properly entered the summary judgment in favor of Horn and Horn Beverage on this issue.
There being no further issues presented, the trial court's judgments are hereby affirmed.
AFFIRMED.
HORNSBY, C.J., and ALMON, KENNEDY and INGRAM, JJ., concur.
[1] CCB Selma is not involved in this dispute.