Rel: May 3, 2024

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2023-2024

_____

### CL-2023-0534

_____

### Elliott Electric Supply, Inc.

### v.

### Veep Electric Service, Inc.

### Appeal from Madison Circuit Court
### (CV-22-900109)

HANSON, Judge.

Elliott Electric Supply, Inc. ("Elliott"), appeals from a judgment entered by the Madison Circuit Court ("the trial court") in favor of Veep Electric Service, Inc. ("Veep"), on Veep's claims against Elliott. We reverse the trial court's judgment and remand the case with instructions.

Procedural History

On January 28, 2022, Veep filed a complaint against Elliott in the trial court. It sought a judgment declaring the legitimacy of a lien claimed by Elliott related to services that Elliott had allegedly rendered but that, according to the complaint, had not been requested by Veep. Additionally, Veep asserted a claim against Elliott for tortious interference with a business or contractual relationship related to Veep's contractual relationship with Buquet & LeBlanc, Inc. ("B&L"). On March 17, 2022, Elliott filed an answer to the complaint; it also asserted counterclaims against of breach of contract and "work and labor" done, pursuant to which it sought an award of damages in the amount of $7,807.04. Veep filed a reply to Elliott's counterclaims.

On March 14, 2023, Elliott filed a motion for a partial summary judgment regarding the claims Veep had asserted against it. On May 8, 2023, following a hearing, the trial court denied Elliott's motion for a partial summary judgment. A bench trial on the merits was commenced on May 30, 2023, and was concluded on June 21, 2023. On June 28, 2023, the trial court entered a judgment "in favor of [Veep] and against [Elliott]" on its claim of tortious interference with a business or

CL-2023-0534

contractual relationship and directed Elliott to pay to Veep "the sum of $30,340.64, plus the costs of the ... action"; it also ruled in favor of Veep on Elliott's counterclaims and denied all remaining requested relief, including Veep's claim seeking declaratory relief. On July 28, 2023, Elliott filed a motion for a new trial and, pursuant to Rule 52(b), Ala. R. Civ. P., for a separate statement of the trial court's findings of facts and conclusions of law. On July 31, 2023, the trial court entered an order denying Elliott's postjudgment motion. Elliott timely filed its notice of appeal to this court.

## Facts

Louis Van Pamel, the president of Veep, testified that Veep is based in Athens and that it performs commercial and industrial electrical-service installation. According to Van Pamel, in 2019, B&L, a company based in Baton Rouge, Louisiana, had solicited a bid from Veep for a construction project in Huntsville. Van Pamel stated that B&L was serving as the general contractor for a new facility being built for Lamar Advertising ("Lamar") and that when Robert Dial, the project manager for B&L, had contacted him about submitting a bid as an electrical subcontractor for that project, Dial had sent Van Pamel the plans for the

3

project and the "specification book" and had "mention[ed] that Elliott ... was the national account holder for ... Lamar." Van Pamel testified that, at the time he submitted his bid, he had been asked to provide value-engineering options, which, he said, are alternatives for fixtures or manufacturers that could potentially save money on the project. He testified, however, that Elliott had ultimately been specified as the supplier for the specific lighting system to be installed. Van Pamel stated that it had not been his decision for Elliott to act as the supplier on the project and that the Lamar project was the first time that he had worked with Elliott. (R. 96, 101).

On December 9, 2019, pursuant to the bid process, Jason Bain, a sales representative for Elliott, sent an e-mail to Veep that included a quote for lighting and lighting controls for the Lamar project in the amount of $93,000. Van Pamel testified that Veep had received the contract for the project from B&L in June or July 2020, that Veep had been responsible for all of the electrical installation and the commissioning for the project, and that Veep had remained the sole electrical contractor throughout the project's completion. On September 9, 2020, Elliott provided an updated quote to Veep, which included

certain additions, increasing the total amount of the bid to $102,035; Van Pamel stated that that quotation was a "hard bid," which entitled Elliott to the full amount quoted. Van Pamel testified that Veep had obtained supplies from both Elliott, which had supplied the light fixtures and controls for the project, and Graybar Electric Company, which had provided electrical supplies and materials, and that Veep had been responsible for installing the supplies provided by both companies. Van Pamel testified that Veep had provided an application for credit to Elliott and had entered into a contract with Elliott, pursuant to which Veep had agreed to purchase the lighting fixtures from Elliott. Van Pamel testified that, during each month of the project, Veep had submitted to B&L an application for a draw for the progress that had been made on the project in that month, along with any required documentation, and that Veep had received a monthly draw from B&L. According to Van Pamel, Veep had paid Elliott and Graybar directly for the parts that they had purchased and delivered, according to each invoice that he received from each company.

Julie McClendon, an employee of Veep, testified that she had been the primary contact for Veep's suppliers beginning in March 2021. With

regard to the Lamar project, she testified that, at the beginning of each month, Veep had received invoices from its suppliers and that she had checked the invoices to ensure that they reflected the items that Veep had ordered and had verified the prices of the items before drafting a check for payment and submitting everything to Van Pamel. According to McClendon, while the Lamar project was ongoing, Veep had received an invoice from Elliott dated June 7, 2021, in the amount of $7,807.04 for "WKA Services." Because Veep had not requested that Elliott provide any services on the project and both McClendon and Van Pamel were uncertain regarding the description for the invoice, McClendon had telephoned and e-mailed Elliott using the contact information provided on the invoice. McClendon testified that she had spoken to Kathryn Mayberry at Elliott's help desk and that Kathryn had informed her that the invoice was for a "lighting start-up," which, Van Pamel explained, is a quality-control inspection by a representative of lighting providers following installation. According to McClendon and Van Pamel, Veep had not ordered a factory start-up from Elliott and Elliott had not performed a factory start-up for the project. Thus, McLendon said, she

6

had sent another e-mail to Elliott, requesting more information regarding the invoice.

Van Pamel testified that he had spoken on the phone to Eric Pertuit, a sales representative for Elliott who had taken over Veep's account from Jason Bain, who, he said, had informed him that the services had not been ordered by Veep, but by B&L. He testified that he had then contacted representatives at Elliott and B&L to clarify that B&L did not have the authority to request services or products on Veep's behalf and that the services outlined had not been completed and should not have been invoiced to Veep. Van Pamel testified that, at some point, he had spoken with Bob Jones, an area manager for Elliott, regarding the invoice for "WKA Services" and that Jones had indicated that the invoice was for engineering services rather than for a factory lighting start-up. (R. 60). Van Pamel stated that he had not requested engineering services from Elliott on the Lamar project and that he had never received an explanation from Elliott for the invoice. McClendon and Van Pamel sent additional communications to Elliott in August 2021, requesting that the invoice for services be removed from Veep's account.

In a letter dated September 15, 2021, which was sent to Lamar via certified mail, Robert Flores, the chief financial officer at Elliott, "claim[ed] a lien on the land, building and improvements" located at Lamar's site for the project in Huntsville in the amount of $7,807.04, which, according to the letter, represented the balance due from Veep; the June 7, 2021, invoice was attached to the letter. Veep and B&L were sent copies of the lien notice. Van Pamel testified that the money owed to Veep for the Lamar project, including retainage and unpaid change orders, had been held subject to the lien notice and that payments from B&L to Veep had been stopped. According to Van Pamel, Veep continued to send communications to Elliott asking Elliott to produce documentation supporting the services that Elliott was claiming had been performed. In a letter dated December 8, 2021, which was sent to Elliott by certified mail, Van Pamel requested that Elliott complete a lien-waiver form that had been sent to Veep by B&L, which, Van Pamel said, would release the lien and absolve Veep from liability.

Van Pamel testified that the last day of work on the Lamar project had occurred in October 2021; that, for Veep's final pay application to be processed, he needed a lien-waiver-and-release form to be signed by both

of his suppliers; that he had received a lien-waiver-and-release form from Graybar but that he had not received one from Elliott; and that the final draw and retainage owed to Veep by B&L had not been paid as a result. He stated that Veep had also been unable to pay another company that it had employed to perform services on the project because Veep had not been paid by B&L. Veep presented evidence indicating that B&L had withheld $25,356.37 from the last pay application that Veep had submitted to B&L on November 4, 2021, and that Veep was owed an additional $4,984.27, which amount Veep requested as damages. Van Pamel testified that Veep could no longer recover the money from B&L pursuant to the terms of Veep's contract with B&L. He stated that Elliott's failure to provide a lien-waiver-and-release form had been the only thing that had kept Veep from receiving payment from B&L.

Van Pamel acknowledged that he had received an e-mail from Jones dated December 20, 2021, in which Jones had stated, among other things, that the June 7, 2021, invoice had not been for "startup and programming" but "for design and engineering services performed by WKA Services on each Lamar Advertising project." Jones testified at the trial that Wells Keown Associates is a representative for Eaton Lighting,

9

of which Elliott is a customer and with which Elliott had signed a national account agreement to supply lighting for Lamar projects. He stated that, pursuant to each project it had undertaken with Lamar, Wells Keown Associates had provided the lighting design for each project before the projects were submitted for bids from subcontractors and that, in this case, the "WKA Services" that had been invoiced by Elliott had been performed before Veep was selected as a subcontractor. Jones testified that someone from Elliott had "misspoke" when they informed Veep that the invoice was for a factory lighting start-up. He stated that the invoice submitted to Veep was for a passthrough cost for services that had been performed by Wells Keown Associates, rather than Elliott, as part of the lighting package that Elliott typically included in each Lamar plant project and that the amounts quoted to and billed to Veep had included the amount for the services provided by Wells Keown Associates. Jones admitted, however, that there was not a line item specifying the "WKA Services" in Elliott's quotes to Veep and that he could not confirm whether Bain had communicated the passthrough costs to Veep because Bain had died during the pendency of the Lamar project and his e-mails had not been preserved. Jones also admitted that the

10

first time another description for the "WKA Services" had been provided to Veep after someone had "misspoke" was in his December 20, 2021, e-mail, after the filing of the notice of Elliott's intent to claim a lien.

Van Pamel testified that Elliott had included in its bid the "WKA Services" without Veep's knowledge or consent and that Veep had paid the amount billed by Elliott for every light fixture and every item that had been included on Elliott's quote.

<u>Analysis</u>

Elliott first argues on appeal that the trial court erred in denying its motion for a partial summary judgment on the claims asserted against it in Veep's complaint. This court has stated, however, that, "when there is a trial on the merits after the denial of a summary-judgment motion, we do not review the denial of the summary-judgment motion." <u>Tucker v. Moorehouse</u>, 58 So. 3d 1262, 1268 (Ala. Civ. App. 2010). In its reply brief on appeal, Elliott cites <u>Murphy Oil USA, Inc. v. English</u>, 333 So. 3d 641, 643 (Ala. 2021), in which our supreme court stated, in pertinent part:

> "As a general matter, 'we do not review a trial court's denial of a summary-judgment motion following a trial on the merits.' <u>Mitchell v. Folmar & Assocs., LLP</u>, 854 So. 2d 1115, 1116 (Ala. 2003). Instead, 'the sufficiency of the evidence at trial would be the significant question on appeal.' <u>Superskate, Inc. v. Nolen</u>, 641 So. 2d 231, 233 (Ala. 1994).

11

> This is not, however, an 'ironclad rule that an erroneous denial of a motion for summary judgment is always rendered moot by a subsequent verdict in favor of the nonmovant, lest we encourage a party to change "testimony or other evidence based on experience gained during the proceedings on the motion for summary judgment."' Wal-Mart Stores, Inc. v. Thompson, 726 So. 2d 651, 654 (Ala. 1998) (citation omitted). When we are not 'confronted with a situation involving a change of testimony, we will not consider whether the defendant was in fact entitled to a summary judgment' but, rather, will consider only whether a trial court properly denied the defendant's motion for judgment as a matter of law. Id."

Elliott argues in its reply brief on appeal that the exception to the general rule that an appellate court will not review a trial court's denial of a summary-judgment motion following a trial on the merits applies in the present case. Specifically, it asserts that, in its response to Elliott's motion for a partial summary judgment, Veep did not "provide any evidence as to how Elliott supposedly caused damages in the form of retainage withholding" and that Veep had "claimed for the first time at trial that its retainage on this project expired." Elliott's reply brief, p. 12-13. We cannot conclude, however, that Elliott has shown any distinction in the evidence relied upon by Veep at the summary-judgment stage and at the trial on the merits. In its motion for a partial summary judgment, Elliott quoted Veep's interrogatory responses, which state, in pertinent

12

part, that Elliott's "intentional refusal to provide documentation of the work Elliott claims was performed led to this dispute and the withholding of the retainage from the project" and that the "withholding of the retainage caused by Elliott's intentional acts has damaged Veep's business relationships." Additionally, Elliott attached to its motion, among other things, the deposition testimony of Van Pamel, in which Van Pamel testified that Veep had been unable to pay another company that had provided services to Veep because Veep had not been paid by B&L, which owed Veep "30,000-plus dollars." Van Pamel also agreed with a statement at his deposition that it had become necessary for Veep to file a lawsuit against Elliott to recover moneys owed, including the retainage, and he asserted that Elliott was responsible for the retainage by sending a notice of intent to claim lien to Lamar and to B&L.

The evidentiary assertions by Veep, as cited by Elliott at the summary-judgment stage, are not inconsistent with Van Pamel's testimony at trial indicating that Elliott's having sent the lien notice was the only reason for the nonpayment of Veep's retainage on the project and that it was no longer able to recover the retainage from B&L based on the terms of the contract between Veep and B&L. Accordingly, we cannot

13

agree with Elliott that Veep changed its testimony or other evidence based on experience gained at the summary-judgment stage such that the exception outlined in Murphy Oil is applicable in the present case. To the extent that Elliott asserts that the trial court erred in denying its summary-judgment motion because it lacked jurisdiction to consider Veep's claim seeking a declaratory judgment, we note that, in its June 28, 2023, judgment, the trial court denied that claim and, thus, there is no adverse ruling from which Elliott can appeal as to that claim. See Lewis v. Providence Hosp., 483 So. 2d 398, 398 (Ala. 1986) ("Only adverse rulings by the trial court are reviewable on appeal.").We decline, therefore, to further consider Elliott's argument that the trial court erred in denying its motion for a partial summary judgment as to each of Veep's claims in its complaint.

Elliott next argues that the trial court erred in entering the judgment in favor of Veep because, it says, Veep failed to prove the essential elements for its claim of tortious interference with a business or contractual relationship. In White Sands Group, L.L.C. v. PRS II, LLC, 32 So. 3d 5, 14 (Ala. 2009), our supreme court outlined the following elements of the tort of wrongful interference with a business or

14

contractual relationship: "(1) the existence of a protectible business relationship; (2) of which the defendant knew; (3) to which the defendant was a stranger; (4) with which the defendant intentionally interfered; and (5) damage." Elliott first asserts that Veep failed to prove that Elliott was a stranger to its contract with B&L. In Waddell & Reed, Inc. v. United Investors Life Insurance Co., 875 So. 2d 1143, 1157 (Ala. 2003), our supreme court discussed that element of the claim, stating, in pertinent part:

> "For the sake of clarity, we adopt the term 'participant' to describe an individual or entity who is not a party, but who is essential, to the allegedly injured relationship and who cannot be described as a stranger. One cannot be guilty of interference with a contract even if one is not a party to the contract so long as one is a participant in a business relationship arising from interwoven contractual arrangements that include the contract. In such an instance, the participant is not a stranger to the business relationship and the interwoven contractual arrangements define the participant's rights and duties with respect to the other individuals or entities in the relationship. If a participant has a legitimate economic interest in and a legitimate relationship to the contract, then the participant enjoys a privilege of becoming involved without being accused of interfering with the contract."

In Ex parte Blue Cross & Blue Shield of Alabama, 773 So. 2d 475, 477 (Ala. 2000), Winston Guthrie, D.M.D., sued Blue Cross and Blue Shield of Alabama ("Blue Cross") for, among other things, tortious

interference with a business or contractual relationship. Dr. Guthrie asserted that Blue Cross had written letters to two of its own insureds, who were Dr. Guthrie's patients, in response to letters it had received from the insureds asking why Blue Cross had denied payment for certain procedures that had been performed on the patients. Blue Cross had explained in the letter sent to each patient that Blue Cross was denying payment on the ground that the procedures were outside the scope of Dr. Guthrie's license as a dentist. Id. Dr. Guthrie alleged that the letters constituted tortious interference in his dentist-patient contractual relations. Id. at 480. Our supreme court affirmed the entry of a summary judgment in favor of Blue Cross on that claim based on two independently sufficient reasons, one of which was its finding that Blue Cross was a party to the contractual relations. Id. Our supreme court stated, in pertinent part:

> "The record establishes both explicitly and implicitly that Dr. Guthrie and his patients contracted together in reliance on the contractual obligation of Blue Cross to pay for dental services covered by the policy between Blue Cross and the patients. Interdependent contractual relations existed among Dr. Guthrie, his patients, and Blue Cross. This contractual situation invokes the rule that a party to a contract cannot be charged with interfering with that contract. Bama Budweiser of Montgomery, Inc. v. Anheuser–Busch, Inc., 611 So. 2d 238 (Ala. 1992), and Lolley v. Howell, 504 So. 2d 253 (Ala. 1987).

16

> While the rights and duties between different sets of parties to a multiparty contract may differ and the respective interests of the parties may compete, the performance of one of the duties or the pursuit of one of the competing interests cannot be validly branded as interference."

773 So. 2d at 480.

In the present case, Van Pamel acknowledged that, when Dial contacted him to bid on the Lamar project, Dial had informed Van Pamel that Elliott was the national account holder for Lamar. Van Pamel testified that, although he had been asked to provide value-engineering options for the project, B&L had decided to use Elliott as the supplier for the lighting package; he stated that using Elliott as the supplier had not been his decision and that the package had been designed with Elliott's having been specified as the supplier for a specific lighting system. According to Van Pamel, Veep had a written contract with Elliott that said that "[Veep] agreed to purchase the fixtures from them." Van Pamel stated that Elliott had supplied the light fixtures for the project, that Veep had paid Elliott and its other suppliers for all parts and fixtures that had been purchased and delivered by them, and that Veep's money for those payments had come directly from B&L. Van Pamel also testified that a lien-waiver-and-release form had been required from both

Elliott and Graybar for Veep's last payment application to B&L to go through and that Veep had received that document from Graybar but had not received that document from Elliott. He admitted that his suppliers, including Elliott, were not paid until Veep's payment application was paid by B&L.

We conclude that the record in the present case establishes that Veep and Elliott contracted together in reliance on the contractual obligation of B&L to pay for the lighting package supplied for the Lamar project. Like in <u>Blue Cross</u>, interdependent contractual relations existed among Veep, Elliott, and B&L. Because Elliott had a legitimate economic interest in and a legitimate relationship to the contract between Veep and B&L, Elliott was a "participant" to the contract in accordance with our supreme court's definition of "participant" in <u>Waddell</u> and, accordingly, Elliott could not be accused of interfering with that contract. <u>Waddell</u>, supra. To the extent Veep argues that Elliott did not have control over the parameters of the work performed on the Lamar project and had no role in the bidding process, we note that, in <u>Waddell</u>, our supreme court rejected an argument "that one can be considered a stranger to the relationship if one does not effectively control

18

performance under the contract" as "too narrow." 875 So. 2d at 1157. Thus, we cannot agree with Veep that Elliott's role as a "mere supplier" requires a determination that Elliott was a stranger to the business relationship between Veep and B&L.

Because, under the circumstances in the present case, Veep failed to establish that Elliott was a stranger to the relationship with which it allegedly interfered, Elliott cannot be liable for interference with that relationship. Accordingly, we reverse the trial court's judgment insofar as it found in favor of Veep on its claim of tortious interference with a business or contractual relationship, and we remand the case for the entry of a judgment on this claim in favor of Elliott. Having concluded that Veep failed to meet the element of its claim for interference with a business or contractual relationship that Elliott must be a stranger to the relationship, we decline to address Elliott's remaining arguments on appeal related to Veep's purported failure to prove additional elements of that same claim. To the extent that Elliott requests in the conclusion to its brief on appeal that this court direct the trial court to "enter judgment in Elliott's favor as to Elliott's affirmative claims in this case," we note that Elliott failed to assert any argument before this court related to the

19

denial of its counterclaims; accordingly, any such arguments are waived, and we decline to further address Elliott's request for relief related to its counterclaims against Veep. See Gary v. Crouch, 923 So. 2d 1130, 1136 (Ala. Civ. App. 2005) ("[T]his court is confined in its review to addressing the arguments raised by the parties in their briefs on appeal; arguments not raised by the parties are waived.").

REVERSED AND REMANDED WITH INSTRUCTIONS.

Moore, P.J., and Edwards, Fridy, and Lewis, JJ., concur.