[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 270 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 271 
The defendants, General Motors Corporation ("GM") and General Motors Acceptance Corporation ("GMAC"), appeal from a judgment entered on jury verdicts in favor of the plaintiffs, Charles Bell, an individual, and Charles Bell Motor Company, Inc. ("the dealership"), totaling $18,838,000, in an action based on allegations of misrepresentation, suppression, and wantonness (1950506). The plaintiffs cross appeal, arguing that the State should not share in its award of punitive damages (1950508).[1] We reverse and remand *Page 272 
as to 1950506. We dismiss as to 1950508.
The evidence, either undisputed or viewed in the light most favorable to the plaintiffs (as required by our standard of review), indicates the following: Charles Bell Motor Company became an authorized GM dealer in 1979. The dealership's primary geographic area of responsibility consisted of the City of Tuskegee and certain other communities in Macon County and several surrounding counties. From the outset, GMAC, a wholly owned subsidiary of GM, provided the primary wholesale and retail financing for the dealership. GMAC financed the dealership's purchases of vehicles from GM ("floor plan" financing) and purchased the dealership's retail sales installment contracts ("retail paper") that it had negotiated with its customers. GMAC also provided financing for capital improvements to the dealership (new dealership facilities). The dealership struggled in the early 1980s; however, beginning about 1983 and continuing through 1987 the dealership enjoyed financial success. The dealership began to struggle again after 1987, losing money in 1988, 1989, and 1991. Through the years, good and bad, GM and GMAC attempted to provide substantial assistance and financial support to the dealership.[2] By 1992, however, the dealership's financial condition was deteriorating rapidly, as was Bell's business relationship with GM and GMAC. After learning that Bell was secretly taping his telephone conversations with representatives of GM and GMAC and that Bell was contemplating taking legal action against them, GMAC conditioned any further financial assistance to Bell on Bell's signing a release of any claims that he might have had against GMAC and its "affiliated companies" arising out of their previous financial transactions. Bell refused to sign the release, and the dealership, which could not obtain financing elsewhere, defaulted on its financial obligations and ceased operations.
Bell and the dealership filed this action, alleging that GM and GMAC had conspired to put the dealership out of business and seeking both compensatory and punitive damages. Specifically, the plaintiffs alleged that GM had violated the Motor Vehicle Franchise Act, Ala. Acts 1981, No. 81-390, *Page 273 
codified at Ala. Code 1975, § 8-20-1 et seq. ("the Dealer Act"), by, among other things, 1) refusing to compensate the dealership for warranty work at the same rates that the dealership charged its retail customers for similar non-warranty service and repairs (see § 8-20-7); and 2) coercing or attempting to coerce the dealership to accept delivery of vehicles that it had not ordered and did not want (see § 8-20-4(1)(a)). The plaintiffs further alleged that GMAC had violated the Dealer Act by, among other things, attempting to condition its approval of a request by the dealership for a loan renewal on the dealership's executing a release in favor of GM and GMAC (see § 8-20-4(3)m.). The plaintiffs also alleged that GM and GMAC had made material misrepresentations, or had suppressed material facts, all for the purpose of putting the dealership out of business. The plaintiffs alleged, in the alternative, that GM and GMAC had acted wantonly in their dealings with the dealership and that their wanton acts had caused it to go out of business. In addition to seeking damages for emotional distress under his misrepresentation, suppression, and wantonness theories, Bell, alleging that GM and GMAC had intentionally caused him emotional distress, also sought damages based on the tort of outrage.
At the trial, GM and GMAC moved for directed verdicts at the close of the plaintiffs' case-in-chief and at the close of all the evidence, asserting that the evidence was not sufficient to submit the plaintiffs' claims to the jury. The trial court denied those motions; however, at the close of all the evidence, the plaintiffs voluntarily dismissed their Dealer Act and conspiracy claims, and Bell dismissed his outrage claim. Thus, the only claims actually submitted to the jury were those for compensatory and punitive damages based on allegations of misrepresentation, suppression, or wantonness on the part of GM and GMAC separately. The jury found in favor of the dealership and awarded it compensatory damages of $1,500,000 against GM and $1,500,000 against GMAC. The jury also assessed $10,000,000 in punitive damages against GM and $10,000,000 in punitive damages against GMAC. The jury awarded Bell, individually, $1,500,000 in compensatory damages for emotional distress against GM and $1,500,000 against GMAC. GM and GMAC moved for a judgment notwithstanding the verdict, again challenging the sufficiency of the evidence, or, in the alternative, for a new trial or a remittitur. The trial court denied the JNOV and new trial motions, but ordered a remittitur of the dealership's compensatory damages awards against GM and GMAC to $1,096,000 and $1,242,000 respectively, thus approving a total compensatory award to the dealership of $2,338,000. The trial court reduced each of the punitive damages assessments against GM and GMAC to $8,000,000, thus approving a total punitive award to the dealership of $16,000,000. Bell's individual awards against GM and GMAC were each reduced to $250,000, leaving intact a total compensatory award for Bell in the amount of $500,000. The plaintiffs accepted the remittiturs. GM and GMAC appealed.
 I. Applicable Standard of Review
The dispositive issues in this case concern whether the evidence was legally sufficient to submit the plaintiffs' claims to the jury. A motion for a directed verdict is a procedural device by which one party tests the sufficiency of the other party's evidence. A motion for a judgment notwithstanding the verdict permits the trial court to revisit its earlier ruling denying the motion for a directed verdict. The ultimate question, as to either motion, is whether the nonmovant has presented sufficient evidence to allow submission of the case or issue to the jury for a factual resolution. For actions filed after June 11, 1987, the standard of review applicable to motions for a directed verdict and for a judgment notwithstanding the verdict is the "substantial evidence rule." See Ala. Code 1975, § 12-21-12. Thus, in an action filed after June 11, 1987, a nonmovant must present substantial evidence supporting each element of his cause of action to withstand a movant's motion for a directed verdict or for a judgment notwithstanding the verdict. However, a nonmovant must present "clear and convincing evidence" supporting each element of his cause of action to withstand the movant's motion for a directed verdict or for a judgment notwithstanding the verdict with respect to a claim for punitive damages. See *Page 274 
Ala. Code 1975, § 6-11-20; Ex parte Norwood Hodges Motor Co.,680 So.2d 245 (Ala. 1996). This calls for a purely objective determination of whether the party having the burden of proof has produced sufficient evidence to create a factual dispute requiring resolution by the jury. In reviewing a motion for a directed verdict and a motion for a judgment notwithstanding the verdict, this Court must view all the evidence in the light most favorable to the nonmovant and must entertain such reasonable evidentiary inferences as the jury would be free to draw. Carter v. Henderson, 598 So.2d 1350 (Ala. 1992).
 II. The Dealership's Claims Against GMAC
GMAC provides retail financing for a GM dealership by purchasing its retail paper. The customer and the dealership determine the finance rate and other terms of the sale before they enter into their contract. Dealerships generally sell these contracts to third parties, such as banks or financing companies. This allows the dealership to immediately obtain the money due under the contract and relieves it of the administrative burden of collecting the payments. After GMAC buys a contract from a dealership, it collects the payments directly from the customer.
The rate at which GMAC buys retail paper from a dealership (the "buy rate" or the "discount rate") is not necessarily the same as the finance rate that the dealership negotiates with its customer. When GMAC's buy rate is lower than the dealership's customer rate, the difference between the two rates is additional profit to the dealership. This profit is called the dealership's "participation." When GMAC buys retail paper, it pays the dealership up front the entire value of the contract, including any participation, even though the customer has not yet paid GMAC anything, and even though the customer will pay over time.
When Bell became a GM dealer in 1979, GMAC agreed to buy retail paper from his dealership under a recourse agreement. Under that agreement, if a customer defaulted, the dealership had to pay GMAC the unpaid balance on the contract. If the vehicle was repossessed, it was returned to the dealership and the dealership was responsible for disposing of it. In 1980, Bell signed an agreement providing for GMAC to buy the dealership's retail paper on a modified nonrecourse basis. Under this agreement, GMAC would assume the responsibility for maintaining the account, including the handling of any repossession and resale of the vehicle, and absorbing any loss that resulted. Use of a nonrecourse plan limits a dealership's exposure, but increases GMAC's risk of loss. GMAC attempts to manage this increased risk in various ways. GMAC's buy rate is higher under the nonrecourse plan than under the recourse plan. Dealerships agree under the nonrecourse plan that GMAC's buy rate will include an additional amount ("nonrecourse reserve increment"), which GMAC does not keep as profit for itself, but instead sets aside in a reserve account used to cover losses that are anticipated from repossessions involving a dealership's contracts. GMAC branch managers are responsible for monitoring each dealership's loss reserve account to make sure that it stays around zero. The account balance can become negative when repossession losses exceed the amount reserved for them. When that happens, GMAC suffers a loss. The number of repossessions that a particular dealership experiences depends largely on the amount of marginal (risky) retail paper that has been purchased from that dealership. If a dealership's reserve account balance becomes negative, GMAC managers may address the problem in various ways. Some approaches are designed to increase the amount available in the reserve account to cover losses; others reduce the number of losses drawing on the account. To add money to the reserve account, the branch manager could raise the dealership's loss increment (and thus its buy rate). But this would apply to all of that dealership's contracts, whether or not they go into default, and could make its prices and rates less competitive. To reduce the number of losses, managers can adjust the branch's purchase policy for the dealership's retail paper by telling GMAC employees to watch for the dealership's riskier paper and to buy less of it. *Page 275 
Each of these alternatives can adversely impact a dealership's ability to sell vehicles. GMAC has therefore developed other alternatives less burdensome to a dealership for reducing GMAC's repossession exposure and for managing a loss reserve. These alternatives are referred to as "modifications" to the nonrecourse agreement, and they reduce the amount of the loss that must be taken out of the dealership's reserve account in the event of repossession. One of these modified plans, referred to among GMAC employees as "Modification C" or "Mod C," charges the dealership back for the full participation that GMAC paid the dealership when it purchased the contract (i.e., the dealership's profit on the financing), up to the amount of the repossession loss. Thus, the dealership agrees to pay back more than the prorata portion of its participation. By contrast, nonrecourse dealerships not on a modified plan are charged back on a prorata basis the portion of their participation that the customer did not pay before repossession (this is referred to generally as the rule of 78). GMAC's Montgomery branch included between 45 and 50 dealerships in 1991. A substantial majority of those dealerships (between 35 and 40), including Bell's dealership, were on Modification C. Modification C reduces GMAC's risk from repossession, so that it can buy more retail paper from the dealerships, thus allowing the dealerships the opportunity to sell more vehicles. Moreover, a dealership is never charged back under Modification C if the customer pays in accordance with his contract, and it never has to pay toward a repossession loss more than the amount of the participation that GMAC paid it to begin with. By contrast, another modification, "D," requires a dealership to share in the loss beyond refunding its participation.
Dealerships wanting to sell GMAC a contract generally telecopy (fax) the customer's application to GMAC for review before it is finalized. GMAC enters the information about the customer and the proposed transaction into its computerized "Mechanized Application Processing System" ("MAPS"). The report generated by MAPS is used by GMAC as an aid in determining whether to buy a contract. MAPS evaluates the proposed contract by determining its payback potential. By examining the customer's background and credit history, MAPS develops mathematical "odds" that the customer will not default. The MAPS score determines which of a number of "tiers" the contract is assigned to — from A to D, with A being the most favorable rating. GMAC charges an increasingly higher buy rate with each tier. In exercising their judgment, GMAC employees evaluate not only the odds that the customer will default on the contract, but also how large any potential loss would be. They take into account the amount of money GMAC is being asked to put at risk, the value of the collateral securing the transaction (the vehicle's wholesale value), and the difference between the two. On occasion, GMAC may condition ("qualify") acceptance of a contract on changes being made to the agreement, such as a large down payment, that will reduce the amount GMAC will have at risk. Branch managers do not usually review the decisions by GMAC employees concerning a contract before the decision is communicated to the dealership. Dealerships that disagree with the decision may attempt to negotiate better terms with GMAC, sometimes by appealing to a branch manager or other upper management. However, the dealership's 1980 agreement providing for GMAC to buy retail paper under the modified nonrecourse plan stated that GMAC would buy only contracts "acceptable to us [GMAC]."
The dealership based its misrepresentation claim against GMAC on allegations that GMAC's control branch manager, Bennett Hall, as well as other representatives of GMAC, had represented to Bell that the dealership had the same benefits that all the other dealerships had and allegations that this representation was false. The dealership based its suppression claim on allegations that other dealerships were being treated differently (more favorably) and that Hall and others had suppressed that information. The wantonness claim was based on allegations that GMAC had consciously decided to treat the dealership differently from other GM dealerships, knowing that damage to the dealership was likely to result from such disparate treatment. The alleged differences *Page 276 
in treatment concerned two aspects of GMAC's financial interactions with the dealership — the repossession chargeback agreement (Modification C) between GMAC and the dealership that governed the rights of the parties in the event an installment contract went into default and the financed vehicle was repossessed, and GMAC's purchase of the dealership's retail paper.
 A. The Repossession Chargeback Agreement
As previously noted, Bell signed an agreement in 1980 providing for GMAC to buy the dealership's retail paper on a modified nonrecourse basis. Under this agreement, GMAC charged the dealership back for the full participation that GMAC had paid the dealership when it purchased the contract, up to the amount of the repossession loss. The dealership's misrepresentation claim was based in part on allegations that Hall had misrepresented to Bell in 1980 and on other unspecified occasions that the dealership had the same benefits that all the other dealerships had and allegations that that representation was false because, according to the dealership, from 1980 up to the fall of 1991, when the dealership was removed from the Modification C plan, the dealerships located on the eastern bypass in Montgomery were not on a modified nonrecourse plan, but, instead, were charged back on a prorata basis (under the rule of 78). GMAC contends that the dealership failed to establish that Hall's representations were, in fact, false. After reviewing the record, we must agree.
The statutory basis for the dealership's misrepresentation claim is Ala. Code 1975, § 6-5-101, which provides:
 "Misrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party, or if made by mistake and innocently and acted on by the opposite party, constitute legal fraud."
The elements of a misrepresentation claim are 1) a misrepresentation of a material fact, 2) made willfully to deceive or recklessly without knowledge, 3) which was justifiably relied on by the plaintiff under the circumstances, and 4) which caused damage as a proximate consequence.Harrington v. Johnson-Rast Hays Co., 577 So.2d 437
(Ala. 1991).
The evidence, viewed in the light most favorable to the dealership, does indicate that Hall made the "same benefits" representation in 1980 at the time the repossession chargeback agreement was signed and on certain unspecified occasions thereafter. However, we can find no evidence tending to show what chargeback plan the Montgomery bypass dealerships were on before 1990. The record is silent on that point. The evidence does show that the Montgomery bypass dealerships were on an unmodified nonrecourse plan in 1990 and thereafter. The evidence also indicates that Hall left his position as branch manager in early 1991. Therefore, the only way any representation on Hall's part could be actionable was if such a representation had been made in 1990 or early 1991, when, according to the evidence, Hall was still the branch manager and the Montgomery dealerships were not on a modified nonrecourse plan. The record, however, does not disclose when Hall's post-1980 representations concerning dealership benefits were actually made.[3] Contrary to the position *Page 277 
taken by the dealership, this failure of proof is not insignificant.[4] The burden was clearly on the dealership to prove that Hall had made a false representation of material fact. Because the dealership failed in this respect, it could not base its misrepresentation claim on any statement that may have been made by Hall.
The dealership also based its misrepresentation claim on allegations that Milton Edrington, who replaced Hall as control branch manager, had also misrepresented to Bell in 1991 that the dealership was on the same chargeback plan as the Montgomery bypass dealerships. The record does support the dealership's allegations in this regard. The essence of the dealership's misrepresentation claim, as we understand it, was that Bell's lack of knowledge that GMAC would consider putting the dealership under a different nonrecourse chargeback plan effectively prevented him from negotiating for such a plan.[5] Edrington replaced Hall as control branch manager in January 1991. The bypass dealerships were not on the Modification C plan in 1991. Bell's testimony indicates that sometime after Edrington replaced Hall, but before he discovered from another GM dealer, Larry Puckett (a Chevrolet dealer in Prattville), that he was not on the same plan as Puckett, Bell asked Edrington if his dealership was on the same repossession chargeback plan as the Montgomery bypass dealerships. Bell testified as follows:
 "Q. Now, so, my question to you — I apologize for not having mentioned Modification C earlier, but my question to you is did there come a time when you finally [got] taken off Mod C?
"A. Yes.
 "Q. That was after your meeting in Montgomery with Mr. Edrington?
"A. Yes.
 "Q. Up until [the] time that you got taken off of Modification C, were you familiar with that term at all?
"A. I had never heard of that term in my life.
 "Q. Let me ask you, in connection with the repossessions of some of your retail customers, had you complained to Mr. Edrington or not about the high rate of repossessions for your customers?
"A. Yes.
 "Q. In making those complaints to Mr. Edrington, had Mr. Edrington, before you complained in this meeting in Montgomery, had he ever told you that you were under Modification C?
"A. Never in my life.
"Q. Had he ever used that term at all?
"A. No, he had not.
". . . .
 "Q. Mr. Bell, right before the break we were talking about the dealer finance participation with GMAC; do you recall that testimony?
"A. Yes.
 "Q. I want to ask you, Mr. Bell, during the time that you were doing business with GMAC, when your customers would have repossessions, were you aware that you were losing all your dealer finance participation every time there was a repossession? *Page 278 
 "A. Yes. When GMAC lost money, yes, I was aware of that, very much aware of that.
 "Q. Now, when you talked to Mr. Edrington about your repossession program, about your rate of repossessions for your retail customers, what, if anything, did Mr. Edrington tell you about whether you were on the same program as the dealers on the bypass?
". . . .
 "A. That I was on the same program that the dealers that were on the bypass were on.
 "Q. What I was going to ask you in my follow-up question, and I do ask you now, Mr. Bell, is this: Tell the jury whether or not you asked any specific questions about either Cobb [a Cadillac-Pontiac dealership located on the bypass in Montgomery] or Brewbaker [a Buick dealership located on the bypass in Montgomery] or any of the bypass dealers of Mr. Edrington?
 "A. Oh, yes. I always asked specific questions about General Cobb, Frank McGough [apparently the operator of a Chevrolet dealership on the Montgomery bypass], about Mr. Brewbaker. I always asked questions about them because they were my competitors.
 "Q. Now, during this conversation with Mr. Edrington, what, if anything, did Mr. Edrington say to you in response to those specific questions about the bypass dealers?
 "A. Mr. Edrington would always tell me that he could not discuss those dealers with me under any conditions."
(Emphasis added.) The evidence indicates that Edrington misrepresented to Bell, up until Bell confronted him with the information that he had obtained from the other GM dealer, that his dealership was under the same repossession chargeback plan as the Montgomery bypass dealerships, and that Bell relied on that misrepresentation by not attempting earlier to renegotiate his chargeback agreement with GMAC. Bell testified as follows:
 "Q. Mr. Bell, I want to ask you this question as we begin to get into that. First of all, do you recall a meeting or conversation that you had in the early fall of 1991 with Mr. Larry Puckett?
"A. I certainly do.
"Q. Who is . . . Larry Puckett?
 "A. Mr. Larry Puckett is a previous GMAC employee.
"Q. Mr. Puckett?
 "A. Mr. Puckett is a previous GMAC employee. He is also the owner of Larry Puckett Chevrolet in Prattville.
 "Q. All right, sir. Do you recall where you and Mr. Puckett were when you had the conversation that you're testifying about?
 "A. Well, it was in Atlanta, Georgia, at a General Motors auto auction.
 "Q. Without getting into anything Mr. Puckett said to you, Mr. Bell, let me ask you what, if any, action did you take after you had this conversation with Mr. Puckett that had to do with the GMAC people over in Montgomery?
". . . .
 "A. What it amounted to, I came back to Montgomery from Atlanta; and I went to Mr. Edrington's office; and what it amounted to, my chargebacks on my reserve were not prorated. I wanted to know, I wanted to know if I was on the same program that the rest of the dealers in Montgomery were on. I was told at the time that I went there that I was on the same program as the rest of the dealers.
". . . .
 "Q. Mr. Bell, I don't want to be repetitious at all about this. I want to be clear about it. Let me ask this question: Were there any dealers that you discussed in that fall meeting at Mr. Edrington's office in Montgomery other than the dealers located on the eastern bypass in Montgomery? If so, tell me.
"A. No.
"Q. All right.
"A. The dealers [on] the eastern bypass.
 "Q. All right. Now I want to know at the time that you went in to talk to Mr. Edrington what you said to Mr. Edrington, *Page 279 
first of all, and then what did Mr. Edrington say to you?
 "A. Well, let me make sure this is right. I told him . . . what I had heard —
"Q. All right, sir.
 "A. And I wanted to know if I was on the same program that the other dealers in Montgomery were on because I had been told that —
". . . .
 "Q. Mr. Bell, when you made your statements to Mr. Edrington in his office, what, if anything, did Mr. Edrington say about the program that you were on and the program that the bypass dealers were on?
"A. That we all were on the same program.
 "Q. Now, did you challenge Mr. Edrington on that statement?
 "A. I did. I went back a second and maybe a third time.
 "Q. What did you say in your subsequent visit or visits to Mr. Edrington about the program that you were on?
 "A. I asked him again if I was on the same program that the dealers were on that were on the bypass.
"Q. What did Mr. Edrington say?
"A. At that time he told me that I was.
 "Q. All right. What, if anything, did you say to Mr. Edrington about what Mr. Puckett had told you?
"A. That his chargebacks were prorated.
". . .
 "Q. My question to you is, first of all, did you tell Mr. Edrington, over there, what Mr. Puckett had said to you?
"A. Yes, I did.
 "Q. All right. After you told Mr. Edrington what Mr. Puckett had said, what did Mr. Edrington say at that time?
 "A. Well, the third time, I think he admitted on the third time that I was on a different program.
 "Q. All right. When you heard that from Mr. Edrington, what did you say to him?
"A. It took a lot out of me.
"Q. What did you say?
 "A. I was very disappointed. I was very angry. Mr. Edrington was very much aware of that.
"Q. Did you tell him that you were upset?
"A. Oh, yes. He knew that.
 "Q. What did you ask him to do for you, if anything?
 "A. I told him that I wanted to be treated fair, and I felt that the dealers that were on the bypass were on a program where their chargebacks were prorated on the reserve and mine was not and I thought it was very unfair and that they had taken a lot of money from me.
 "Q. Mr. Bell, did you ask Mr. Edrington to give you your money back?
"A. I certainly did.
 "Q. What did Mr. Edrington say when you asked for your money back?
 "A. Mr. Edrington told me that was his call and he was not going to give me my money back but he would put me on the program that the dealers, that the other dealers were on on the bypass."
For the reasons set out above, we conclude that GMAC was not entitled to a judgment as a matter of law on this aspect of the dealership's misrepresentation claim.
The dealership based its suppression claim on allegations that GMAC did not inform it that Modification C was not the only nonrecourse chargeback plan available to GM dealerships. Specifically, the dealership argues that GMAC should have disclosed to it that the Montgomery bypass dealerships were on a different nonrecourse chargeback plan. GMAC argues that the terms of its contracts with other dealerships were confidential and that it was under no legal duty to disclose to the dealership the nature of other chargeback plans that other dealerships may have been operating under.
Initially, we note again that the record contains no evidence tending to show what chargeback plan the Montgomery bypass dealerships were on before 1990. Therefore, the dealership's suppression claim would have to be based on an alleged failure on the *Page 280 
part of GMAC (Hall and Edrington) to disclose this information during 1990 and thereafter.
The statutory basis for the dealership's suppression claim is Ala. Code 1990, § 6-5-102, which provides:
 "Suppression of a material fact which the party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case."
The elements of a suppression claim are 1) a duty to disclose the facts, 2) concealment or nondisclosure of material facts by the defendant, 3) inducement of the plaintiff to act, and 4) action by the plaintiff to his injury. Wilson v. Brown,496 So.2d 756 (Ala. 1986). Under § 6-5-102, silence is not fraud unless an obligation to communicate a material fact exists. Such an obligation may arise where a confidential relation or "particular circumstances" exist. Trio Broadcasters, Inc. v.Ward, 495 So.2d 621 (Ala. 1986).
This Court has defined a "confidential relationship" as follows:
 " '[A relationship in which] one person occupies toward another such a position of adviser or counselor as reasonably to inspire confidence that he will act in good faith for the other's interests, or when one person has gained the confidence of another and purports to act or advise with the other's interest in mind; where trust and confidence are reposed by one person in another who, as a result, gains an influence or superiority over the other; and it appears when the circumstances make it certain the parties do not deal on equal terms, but, on the one side, there is an overmastering influence, or, on the other, weakness, dependence, or trust, justifiably reposed; in both an unfair advantage is possible. It arises in cases in which confidence is reposed and accepted, or influence required, and in all the variety of relations in which dominion may be exercised by one person over another.' "
See Holdbrooks v. Central Bank of Alabama, N.A.,435 So.2d 1250, at 1252 (Ala. 1983), quoting 15A C.J.S. Confidential
(1967).
There is no question that the dealership and GMAC were, at all times, dealing with each other at arm's length. The evidence shows that Bell was intelligent and knowledgeable about the workings of an automobile dealership. In short, he was an experienced businessman. The evidence also shows that GMAC was in business to purchase retail paper from GM dealerships, provided that that paper was acceptable to GMAC. Although Bell sought, and GMAC provided, advice and financial assistance to the dealership, there is no evidence indicating that a confidential relationship existed between the dealership and GMAC that would impose a duty on GMAC to inform the dealership that Modification C was not the only nonrecourse chargeback plan used by GMAC. See Norman v. Amoco Oil Co.,558 So.2d 903 (Ala. 1990), wherein this Court held that Amoco was under no duty to give a detailed explanation of its "profitability index" to one of its franchisees (Norman), even though Amoco used that index as a basis for not renewing Norman's contract. There is no evidence that GMAC was under any contractual obligation to allow the dealership to pick and choose which plan it would operate under. To the contrary, the evidence indicated that the majority of the dealerships in the Montgomery branch had at one time or another been on the Modification C plan, presumably to reduce the risk of loss to GMAC resulting from its purchase of marginal or risky retail paper. In this respect, GMAC's relationship with the dealership was similar to that of creditor and debtor, much like the relationship that exists between a bank and its customer, where the creditor dictates the terms for extending credit. In the absence of special circumstances, such as when a customer reposes trust in a bank and relies on financial advice, no fiduciary or confidential relationship exists between a creditor and a debtor. See Power Equipment Co. v. First AlabamaBank, 585 So.2d 1291 (Ala. 1991).
Application of the "particular circumstances" language contained in § 6-5-102 necessarily requires a case-by-case consideration of several factors. Quoting from Jim Short FordSales, Inc. v. Washington, *Page 281 384 So.2d 83, 86-87 (Ala. 1980), this Court, in Berkel Co.Contractors, Inc. v. Providence Hospital, 454 So.2d 496, 505
(Ala. 1984), stated:
 " 'A duty to speak depends upon the relation of the parties, the value of the particular fact, the relative knowledge of the parties, and other circumstances. Hall Motor Co. v. Furman, 285 Ala. 499, 234 So.2d 37 (1970). . . . Thus, each case must be individually examined to determine whether a duty of disclosure exists; a rigid approach is impossible, and, indeed, the words of the statute itself counsel flexibility.' "
Before an obligation to disclose can be imposed under the "particular circumstances" of a case, the relationship existing between the parties, while not necessarily required to be confidential, must nonetheless be such that a disclosure of material information is dictated. In Bama Budweiser ofMontgomery, Inc. v. Anheuser-Busch, Inc., 611 So.2d 238, 246
(Ala. 1992), this Court, citing Norman v. Amoco Oil Co., supra, noted that "[w]hen the parties to a transaction deal with each other at arm's length, with no confidential relationship, no obligation to disclose arises when information is notrequested." (Emphasis added.) As previously noted, GMAC had the right to contractually limit its exposure by requiring the dealership to participate in the Modification C plan as a condition to its purchasing the dealership's retail paper. GMAC was certainly within its rights in doing this to protect its financial interests. Considering the particular business enterprise involved here; the fact that Bell was an experienced businessman; the fact that it was GMAC's policy to treat as confidential its business dealings with individual GM dealerships; and the fact that GMAC was under no contractual obligation to allow the dealership to participate in any particular chargeback plan, we cannot hold that GMAC was under any general legal duty to disclose to the dealership the existence of other nonrecourse chargeback plans that it was using with other dealerships. Therefore, as our previous discussion illustrates, because there is no evidence indicating that Hall made a misrepresentation to the dealership with respect to the chargeback plan, the dealership could not base its suppression claim on any allegations of nondisclosure by Hall. However, because the evidence indicates that Bell specifically asked Edrington about the chargeback plan and that Edrington misrepresented that the dealership was on the same plan as the Montgomery bypass dealerships, a duty on GMAC's part to disclose the truth arose.[6] When a party, in a commercial setting, elects to make a representation, the party is under a duty to make a full and fair disclosure. This duty is not unlike the obligation that may arise between parties in a confidential or fiduciary relationship. See Sperau v. FordMotor Co., 674 So.2d 24 *Page 282 
(Ala. 1995), judgment vacated 517 U.S. 1217, 116 S.Ct. 1843,134 L.Ed.2d 945 (1996). Therefore, GMAC was not entitled to a judgment as a matter of law with respect to the dealership's suppression claim.
With respect to the wantonness claim, GMAC was under no contractual obligation to let the dealership operate under an unmodified nonrecourse chargeback plan, and there is no common law duty that we are aware of that would preclude a finance company, such as GMAC, from dictating reasonable terms to govern its purchasing of retail sales contracts from a company such as the dealership. The dealership had no legal basis for insisting that it be allowed to operate under the chargeback plan of its choosing. The absence of a duty on the part of GMAC in this respect was fatal to the dealership's wantonness claim, and the trial court erred in submitting that claim to the jury.
 B. GMAC's Purchase of the Dealership's Retail Paper
The dealership specifically alleged that GMAC's representatives had misrepresented to it that it was being treated the same "as the Montgomery bypass dealers," because, it says, GMAC was buying less of its retail paper than it was buying from those Montgomery dealerships. This alleged disparate treatment also formed the basis for the dealership's suppression claim (that GMAC did not disclose that it was treating the Montgomery bypass dealerships more favorably by buying more of their retail paper), as well as its wantonness claim (that GMAC consciously disregarded the consequences of intentionally discriminating against the dealership in its retail paper purchasing policies).
After carefully reviewing the briefs, and after an exhaustive review of the record, we conclude that there was insufficient evidence for a jury to reasonably find that Hall, or any other representative of GMAC, lied to Bell about GMAC's retail paper purchasing policies. The record discloses no contract requiring GMAC to buy any particular amount of the dealership's retail paper. To the contrary, the dealership's 1980 agreement with GMAC stated that GMAC would buy contracts "acceptable to us [GMAC]." The dealership's misrepresentation claim is based, in part, on allegations that Gregory Bemister, Hall's assistant, had told Bell that GMAC was "buying deeper into the pot" and that GMAC was treating the dealership the same "as the Montgomery bypass dealers." Bell testified as follows as to what was meant by "buying deeper into the pot":
 "Q. All right, sir. Are you saying to this jury, Mr. Bell, that GMAC did not repeatedly approve deals for you on paper where the ratings were 'C' papers in many instances, 'D' papers in many instances? And that GMAC did, in fact, buy not only deeper, but very, very deeper into the pot for Charles Bell Motor Company? Is it your sworn testimony that GMAC did not do that?
 "A. I couldn't say that they bought deeper in the pot, because most of my customers they gave 'D tier.' And, if that's deeper into the pot, I guess that's deeper into the pot."
The plaintiffs' attorney explained the phrase during argument at trial, as follows:
 "Deeper than what? The logical assumption is deeper than they [GMAC] would with other GM dealers who were not sending them all of their contracts like Mr. Bell was doing."
Bemister testified as follows:
 "What we're talking about when we're talking about 'buying deeper in the pot' is that if you get a wide range of business from a particular dealer, one of the things that GMAC offers a dealer because we feel that we have such a good collection effort is that we can buy deals that our competitors can't buy. Because normally banks aren't staffed with a collection staff to go out and knock on doors or to call people. They have to buy more limited or narrower range of customers. So with GMAC if a dealer is sending us all of his business and its a good spread of business, a good mix, then we can go ahead and buy some of those deals that our competition normally wouldn't." *Page 283 
Another GMAC employee, James Redden, testified that "buying deeper to me just meant buying more marginal deals."
Milton Edrington, who replaced Hall on January 1, 1991, testified that he told Bell later that year that the dealership "was being treated like other dealers in his area" and that the dealership "was receiving the same considerations as all the dealers in his area." Edrington explained:
 "If you mean was the relationship between his dealership and GMAC the same as it was with all dealerships, it was not. But the consideration he was given would have been the same, any difference in the treatment would have been based on the financial condition of the dealership and things like that."
Edrington also answered in the affirmative when asked whether giving the dealership "the same consideration as any other dealership . . . sometimes result[ed] in a different decision for the Bell dealership"; however, he answered in the negative when asked whether GMAC ever made such a different decision "that [GMAC] felt was not justified because of the financial condition."
The dealership advertised across the country with a toll-free telephone number and ran a number of print media ads for customers with "low credit, little money, no credit, weak credit." Bell understood, however, that GMAC would buy contracts with people who had low credit and little money only "[i]f they [GMAC] found that it was a good customer." In July 1991, Bell began complaining to GMAC that it was not buying the dealership's retail paper at "branch average." However, the record indicates that the dealership was sending GMAC an extraordinarily higher percentage of contracts rated in the worst category of "very high risks" than other dealers sent. GMAC nonetheless was buying the dealership's retail paper at branch average. As a result, GMAC experienced a repossession rate almost twice the branch average on the dealership's retail paper. Thus, it is clear that GMAC bought many marginal contracts from the dealership. Even with chargebacks under Modification C, the dealership's loss reserve was $200,000 in the negative as of mid-1991.
Bell also complained in 1991 that the dealership's approval rate was low because GMAC's personnel in charge of approving the purchase of retail paper were not evaluating his contracts thoroughly. Because GMAC felt that the dealership's high employee turnover was causing incomplete applications to be presented to GMAC, GMAC created a special system to increase the likelihood that the dealership's retail paper would be approved. Under this system, a contract that might otherwise have been rejected was to be reviewed to identify any important missing information that the dealership might be able to supply. In addition, before the responsible GMAC employee informed the dealership that GMAC was rejecting or conditioning a dealership contract, it had to be reviewed by management. The evidence showed that some contracts were approved by GMAC that otherwise would not have been. At the dealership's request, it was taken off Modification C in the fall of 1991. Despite the dealership's large negative loss reserve balance, there is no indication that GMAC adjusted its purchase policy or decreased its buy rate for the dealership.
The dealership called an economist, Charles Carter, to testify in support of its allegations that GMAC had falsely represented that it was "buying deeper into the pot" and that it was treating the dealership "just like all the rest" of the dealerships. Carter performed a computer analysis of GMAC's purchases of retail paper from the dealership. However, Carter did not compare GMAC's purchases from the dealership with the "branch average" of GMAC's purchases from the other GM dealerships in the branch. Nor did Carter compare GMAC's purchases of retail paper from the dealership with GMAC's purchases from all those dealerships that were not sending all or most of their contracts to GMAC. Furthermore, Carter did not analyze the extent to which GMAC agreed to buy contracts from the dealership that GMAC's "competition [other banks or financial institutions] normally wouldn't" have bought. Instead, Carter compared GMAC's purchases of retail paper from the dealership with its purchases from three dealerships on the eastern bypass in Montgomery *Page 284 
by comparing the MAPS scores of a number of applications submitted to GMAC for approval. Carter made this comparison even though he had no evidence that the financial condition, repossession rate, or other circumstances of any of the bypass dealerships were comparable to those of Bell's dealership. Carter concluded that between 1986 and 1993 GMAC rejected approximately 52% of the dealership's applications and that GMAC would have approved about 25% of the dealership's rejected applications if GMAC had purchased contracts from the dealership at the same rate and with the same MAPS scores that it did from the three bypass dealerships.[7] (This would have amounted to 25% of the 52% that were rejected, or approximately 13% with respect to the total number of applications submitted.) Carter concluded that the discrepancy between the rate at which GMAC purchased retail paper from the dealership and the rate at which GMAC purchased retail paper from the dealership's Montgomery bypass competitors was "statistically significant"; however, he offered no opinion as to why there should have been a difference between the amount of retail paper purchased from the dealership and the amount purchased from the other three dealerships.
Although Bell testified that he had been told by Hall and others that GMAC had no discretion to override the MAPS scoring with respect to a credit application, GMAC presented witnesses who explained, without contradiction, that a contract's MAPS odds score was only the beginning of GMAC's analysis and that MAPS odds and reports were only a tool for GMAC to use in deciding whether to agree to purchase a contract.[8] An additional important factor for GMAC concerned how much it was being asked to finance above the collateral's wholesale value. The undisputed evidence suggested that the greater the spread between the amount financed and the collateral's wholesale value the higher GMAC's risk was and the less likely it would be to agree to buy a given contract. Customers with identical MAPS odds scores could be turned down at one dealership but approved at another, if one dealership charged the customer more for the same vehicle than the other dealership did or if the information contained in the two applications with respect to the two customers was different.[9] The dealership's gross profits per new *Page 285 
car sold were higher than the average for other dealerships in its zone. A former manager of the dealership testified that a number of its potential retail sales had "too much profit" built into them to get approved by GMAC and that he had had to "restructure" some of the dealership's deals in order to get them approved by GMAC. Carter did not take this into account. In fact, Carter's data showed that even the Montgomery bypass dealerships experienced different rates of acceptance and rejection of retail paper that MAPS had scored the same. To sum up, the dealership's evidence (Carter's testimony) did show that GMAC had declined to purchase a "statistically significant" percentage of the dealership's retail paper, in comparison to GMAC's purchase of retail paper from the Montgomery bypass dealerships. However, the basic issue presented by the dealership's misrepresentation claim was not whether the dealership had had a "statistically significant" amount of its retail paper rejected by GMAC, as compared to the bypass dealerships, or whether the dealership would have possibly made more money had GMAC purchased more of its retail paper. The dispositive issue was whether GMAC had provided the dealership with the same "benefits" or had treated the dealership the "same," vis-à-vis the Montgomery bypass dealerships. The evidence simply did not show that Hall's representations that GMAC was "buying deeper into the pot" and that the dealership had the same benefits that all the other dealerships had were false. The only reasonable inference one could draw from the evidence is that GMAC based its purchasing decisions primarily on the financial risks involved in accepting a particular dealership's retail paper. Our examination of the record, including Carter's testimony, has revealed no evidence from which one could reasonably infer that GMAC discriminated against the Bell dealership and in favor of any dealership on the eastern bypass in Montgomery by deliberately buying more retail paper from those dealerships than it did from the Bell dealership. To the contrary, the record is replete with testimony indicating that GMAC worked diligently with the dealership to ensure that those contracts that could, from a sound business perspective, be purchased were in fact purchased. Therefore, we conclude that the evidence was insufficient to support the dealership's misrepresentation and suppression claims, for they were based on allegations that GMAC either misrepresented that it was treating the dealerships the same as the Montgomery bypass dealerships or did not disclose that it was treating the bypass dealerships more favorably by buying more of their paper.
As to the wantonness claim, the dealership argues in its brief that it "established from the evidence that 'with knowledge of the danger or [with] a consciousness that injury was likely to result from an act or omission to act,' GMAC nevertheless purposefully and intentionally defrauded [it] with regard to the matter of retail paper buying policies, procedures, and actual practice." According to the dealership, "[t]here clearly was a 'conscious appreciation of the wrong' because Bennett Hall, [Milton] Edrington and Greg Bemister all, separately and severally, made the same misrepresentations and suppressed the same information from Charles Bell." This argument suggests that there is a cause of action in Alabama for "wanton intentional fraud." The legislature has defined "wantonness" as "[c]onduct which is carried on with a reckless or conscious disregard of the rights or safety of others." See Ala. Code 1975, § 6-11-20(b)(3). This definition is consistent with our basic understanding of the difference between willfulness and wantonness. See, e.g., Dixie Electric Co. v.Maggio, 294 Ala. 411, 414, 318 So.2d 274, 276 (1975), wherein Justice Shores, writing for this Court, noted:
 " ' "Wantonness" is the conscious doing of some act or the omission of some duty under the knowledge of the existing conditions, and conscious that from the doing of such act or omission of such duty injury *Page 286 
will likely or probably result. . . .' Kilcrease v. Harris, 288 Ala. 245, 251, 259 So.2d 797, 801 (1972); Culpepper Stone Plumbing Heating Co. v. Turner, 276 Ala. 359, 162 So.2d 455
(1964). One may be guilty of wanton misconduct without actual intent to [injure] anyone. Birmingham Railway, Light Power Co. v. Murphy, 2 Ala. App. 588, 56 So. 817 (1911). In this sense, '. . . A willful or intentional act is not involved in wantonness. . . .' Atlantic Coast Line R. Co. v. Brackin, 248 Ala. 459, 461, 28 So.2d 193, 194
(1946)."
See, also, Rosen v. Lawson, 281 Ala. 351, 356, 202 So.2d 716,720 (1967) ("[i]n wantonness, the party doing the act or failing to act, is conscious of his conduct, and without having the intent to injure, is conscious, from his knowledge of existing circumstances and conditions, that his conduct will likely or probably result in injury").
The dealership has made it very clear in its written and oral arguments to this Court that its fraud claims were based on allegations that GMAC set out intentionally to put it out of business. Thus, we find unpersuasive any suggestion that the dealership can piggyback its wantonness claim on its fraud claims. A concept of a "wanton intentional fraud" would be an unacceptable contradiction in the law.
However, as we understand the complaint, the dealership's wantonness claim was actually based on allegations that GMAC had consciously treated the dealership differently from other GM dealerships (namely, those on the Montgomery bypass) by buying on average more retail paper from those other dealerships. According to the dealership, GMAC knew that this alleged disparate treatment was likely to result in financial loss to the dealership. In this regard, we note that GMAC was under no contractual obligation to buy any particular amount of the dealership's retail paper. To the contrary, the dealership's 1980 agreement with GMAC stated that GMAC would buy contracts "acceptable to us [GMAC]." Thus, GMAC owed no duty to the dealership, outside the confines of its agreement with the dealership, to purchase the same amount of retail paper that it was purchasing from other GM dealerships, including those on the Montgomery bypass. See Cahaba Seafood,Inc. v. Central Bank of the South, 567 So.2d 1304 (Ala. 1990). And, as previously noted, the evidence was insufficient to show that GMAC did not, relatively speaking, treat the dealership the "same" as the Montgomery bypass dealerships, insofar as purchasing retail paper was concerned. The wantonness claim should not have been submitted to the jury.
 III. The Dealership's Claims Against GM
The dealership's fraud claims against GM were based on allegations that GM had misrepresented that it would enforce its rules governing the purchase of "program"[10] vehicles from GM-Sponsored auctions against all GM dealerships, and that GM had failed to disclose (had suppressed) that it did not uniformly enforce its rules. The dealership also alleged that GM had engaged in wanton conduct by consciously violating §8-20-4(3)a., a part of the Dealer Act (by enforcing the auction rules against it but not against other GM dealerships), knowing that such a violation would likely or probably result in injury to the dealership.
The pertinent facts surrounding these claims are as follows: GM began auctioning program vehicles to its authorized dealerships in the mid-1980s. Certain written rules governed the purchase of these program vehicles, including the following set out in a "GM-Sponsored Auction Policies and Procedures" manual:
"Resale Requirements.
 "Dealer agrees to use these vehicles to enhance its selling and leasing efforts in its Area of Primary Responsibility and to sell or lease the vehicles to retail customers from the dealership's GM approved Dealership Location.
 "The resale of vehicles purchased at a GM-Sponsored Auction to wholesalers, brokers, lessors, non-GM dealers, or different line make GM dealers, or the purchase of vehicles at GM auctions for export sales, is not within the intent of the program. Soliciting or procuring different line make *Page 287 
auction vehicles from other GM dealers is also not within the program's intent. Any failure to comply with the requirements of the GM Auction Program, or any attempt to circumvent the intent of this program, as determined by the GM Auction Department in its sole discretion, will result in suspension of the Dealer's privilege to participate in GM-Sponsored Auctions.
 "We hope you agree that the GM Auction Program and that adherence to these guidelines for participating dealers will enhance the value of General Motors franchises everywhere.
"Holding.
 "Vehicles purchased at auctions should reasonably be what a dealership expects to sell or lease to retail customers from its GM approved Dealership location in the short term. However, in the event a dealer has not been able to sell a unit purchased at a GM-Sponsored Auction within 45 days from the date of purchase, the dealer may offer the vehicle for sale at a GM Dealer Tailgate Sale following a regularly scheduled GM-Sponsored Auction.
"Dealer Audits.
 "GM has established certain requirements for dealer participation in GM-Sponsored Auctions. By participating in the auction, Dealer agrees to authorize the GM Auction Department, and its authorized representative, to examine, reproduce and take copies of dealer records related to the purchase of vehicles at GM-Sponsored Auctions, and the sale or lease of such vehicles. Such examinations will only be conducted during regular business hours, and upon written notice to dealer. Failure of Dealer to comply with such a request will result in the suspension of Dealer's privilege to participate in GM-Sponsored Auctions."
Bell received and understood these rules. George Schmid, the manager of GM's Pontiac Division's Atlanta zone, testified that he had informed Bell that the auction rules had to be "strictly observed by all the dealers." The representations set out in GM's policies and procedures manual and the representation made by Schmid formed the primary basis for the dealership's misrepresentation claim. In December 1989, GM suspended the dealership's auction privileges because, according to GM, the dealership had violated the auction rules in the manner in which it had purchased and disposed of a number of program vehicles.[11] Auction privileges were eventually restored to the dealership, with the assistance of Schmid; Lee McDaniel, a representative of GM's Minority Dealer Development Department; and Bill Johnson, a GM auction coordinator. The dealership continued thereafter to purchase vehicles at auction. This suspension did not form the basis of the dealership's claims against GM.
However, according to Bell, he was later told by an unidentified person at a GM-sponsored auction in Moody, Alabama, that he could not purchase 25 vehicles. Bell testified that Gordon Warren, the assistant sales manager of GM's auction department, told him later that the auction personnel had "[done] what they should have [done]" in declining his purchase request. Bell took this to mean that GM was denying his request because he was violating auction rules by attempting to purchase too many vehicles (i.e., more vehicles than would have been necessary "to enhance [the dealership's] selling and leasing efforts in its Area of Primary Responsibility"). GM's apparent reasoning in this regard proved to be correct because, according to the undisputed evidence, Bell had wanted to implement an "enhanced" program vehicle sales policy at his dealership, whereby he would purchase large numbers of program vehicles at auction, hold them for 45 days, and then sell them at wholesale. This plan violated GM's auction rules. Bell planned to finance his auction purchases with the assistance of Bob Lee Alphin, a Georgia used car dealer, who had agreed to invest $1,100,000 in the venture. It was for the purpose of implementing this new "enhanced" program-vehicle purchasing policy that Bell had traveled to the Moody auction. *Page 288 
The dealership based all three of its claims against GM primarily on allegations that GM had not enforced its auction rules against one other GM dealer, Devon Lowe.[12] The evidence indicates that Lowe, who owned, or had an interest in, three GM dealerships, purchased approximately 500 program vehicles per week from GM-sponsored auctions, held them for 45 days, and then sold them wholesale to other dealerships. The evidence also suggests that this volume purchasing was contrary to the intent of the auction rules and that although it had caught the attention of GM's management, no disciplinary action had been taken against Lowe for this activity. According to the dealership, GM discriminated against it by not enforcing the auction rules against Lowe. Also, according to the dealership, GM was guilty of misrepresenting that all GM dealerships had to comply with the auction rules, and of suppressing information that would have indicated that it was not enforcing the rules against Lowe. What we deem to be the linchpin of the dealership's argument, which was made in response to GM's contention that the dealership could prove no damage, is set out in various parts of its brief as follows:
 "Had the relevant information been properly and timely shared with [the dealership], it would have immediately apprised Mr. Bell that there were not only 'differences,' but substantial differences, in how the GM Auction Department Rules were interpreted and enforced between and among various GM dealerships. Bell Motor Company could then have taken appropriate action, under the Alabama Motor Vehicle Franchise Act or otherwise, to avoid the injuries which it ultimately suffered as a result of its lack of proper information and knowledge. One of the relevant provisions in the franchise act, set out in the original complaint as affording the plaintiffs a basis for relief, has to do with the prohibition against a manufacturer's 'establish[ing] or implement[ing] a plan or system for the allocation and distribution of new or used
motor vehicles to motor vehicle dealers which is arbitrary, capricious or unreasonably discriminatory. . . .' (Emphasis added.) See: Section 8-20-4(3)a. of the Code of Alabama (1975). Clearly, the unequal enforcement interpretation of the GM Auction Department Rules constituted an arbitrary system by the manufacturer for the distribution of used (e.g., 'program') vehicles and Charles Bell Motor Company was injured as a result of that misconduct. Whether, based on the evidence, the complaints advanced by the plaintiffs are under the rubric of fraud, suppression, or a violation of the Motor Vehicle Franchise Act, the undisputed fact remains that the dealership has been injured and it is clearly entitled to a redress of all the grievances associated with that injury.
". . . .
 "[The formula for calculating the damage suffered by the dealership as a result of GM's failure to enforce the auction rules against Lowe] was grounded in available capital for the Bell dealership of $1.1 million from Mr. Alphin; an average 'program car' purchase price of $8,000; a minimum net profit (after interest, carrying charges, auction costs, transportation) of $500 per unit and a 45 day holding period for the vehicles at the Bell dealership in Tuskegee.
". . . .
 ". . . [I]t was altogether reasonable for the damages to be calculated to the time of trial. Had Bell Motors been permitted to pursue its GM Auction expansion in 1991 with outside, available, capital, it would have reasonably realized net profits of approximately $34,250 every 45 days. This would have been over and above the original capital which would be utilized again for the purchase of additional program cars. [The $34,250 every 45 days is derived by calculating 50% of the net profit on 137 units per 45 days at a minimum net profit of $500 per vehicle, all of which is supported by substantial evidence.] This would have translated into a reasonable net dealership profit of $277,765 per year not including interest or other income these funds would be expected to generate. *Page 289 
After carefully examining the briefs and the record, we conclude that GM was entitled to a judgment as a matter of law on all three of the dealership's claims. The dealership's argument, as we understand it, is that had it known that GM was not enforcing the auction rules uniformly against Lowe with respect to his volume purchases of program vehicles,[13] it could have filed an action under the Dealer Act and sought damages and injunctive relief. Section 8-20-4(3)a. states that it is an unfair and deceptive trade practice for a manufacturer, such as GM, "[t]o adopt, change, establish, or implement a plan or a system for the allocation and distribution of new or used motor vehicles to motor vehicle dealers which is arbitrary, capricious, or unreasonably discriminatory or to modify an existing plan so as to cause the same to be arbitrary, capricious, or unreasonably discriminatory." Section 8-20-11
provides as follows:
 "Notwithstanding the terms, provisions, or conditions of any dealer agreement or franchise or the terms or provisions of any waiver, and notwithstanding any other legal remedies available, any person who is injured in his business or property by a violation of this chapter by the commission of any unfair and deceptive trade practices, or because he refuses to accede to a proposal for an arrangement which, if consummated, would be in violation of this chapter, may bring a civil action in a court of competent jurisdiction in this state to enjoin further violations, to recover the damages sustained by him together with the costs of the suit, including a reasonable attorney's fee."
(Emphasis added.)
Thus, we agree with the dealership, based on the evidence before us (which we must view in the light most favorable to the dealership), that it could have filed an action under the Dealer Act and sought damages and injunctive relief based on GM's favorable treatment of Lowe. However, nothing in the Dealer Act or otherwise in the record would indicate that the dealership could have forced GM to change its auction rules so as to allow the dealership to purchase program vehicles in volume for the purpose of selling them at wholesale. Although there was evidence indicating that GM did not enforce the auction rules uniformly with respect to Lowe, there was no evidence that GM did not adequately enforce its rules as to the vast majority of its other dealerships or that it had, or would have, considered modifying its auction rules so as to make it permissible, from a GM policy point of view, for dealerships to purchase program vehicles at auction for the purpose of selling them at wholesale. Stated differently, all the dealership could have accomplished by suing GM under the Dealer Act would have been limited to enjoining GM from discriminating against it by favoring Lowe and to recover whatever damages it might have incurred as a result of Lowe's violation of the rules. We can find no legal basis to support the dealership's argument that it could have sued under the Dealer Act and secured the right to sell 137 vehicles every 45 days at a profit of $500 per vehicle ($1,096,000). Consequently, we can find no legal support for the dealership's contention that it suffered damage as a result of misrepresentation or suppression on the part of GM. The undisputed evidence shows that the dealership was attempting to secure an advantage over GM dealerships on the eastern bypass in Montgomery (who did not participate in the auction program) by violating GM's auction rules prohibiting the volume purchase of program vehicles for the purpose of selling them at wholesale. The dealership based its fraud claims on the faulty premise that it had the right to do this, when, in fact, it had only the right under the Dealer Act to force GM to enforce its rules against Lowe. Because damage is an essential element of a fraud claim, and because the dealership could not prove that any fraud on GM's part arising out of its favorable treatment of Lowe caused it any damage for which it could recover in this fraud action, we hold that the trial court erred in not entering a judgment for GM as a matter of law on the misrepresentation and suppression claims. *Page 290 
As to the wantonness claim, the dealership alleged in its complaint that GM had engaged in "[r]epeated intentional and conscious violations of the relevant provisions of the [Dealer Act]." It argued in its brief on appeal as follows:
 "The original complaint alleged that the actions constituting wantonness included, but were not necessarily limited to, various matters set out as examples of wanton misconduct. One of the allegations incorporated by reference 'repeated intentional and conscious violations of the relevant provisions of the Alabama Motor Vehicle Franchise Act, as previously enumerated in the complaint.' Since the Act violations included the arbitrary system for allocating new and used motor vehicles to dealers, the complaint stated a cause of action for wantonness against GM in connection with its Auction Program. Even if this had not been the case, evidence presented or an issue raised and tried without objection results, by operation of law, in the pleadings being deemed to conform to the evidence. [Citations omitted.]
 "For the same reasons as supported the wantonness claims dealing with the repossession chargeback scheme and the retail paper buying fraud, the jury was amply justified in finding for the plaintiffs on their claims of wantonness in connection with the misrepresentation and suppression associated with the GM Auction Department issue. As a matter of law, for the same reasons they proved their fraud and suppression claims, wantonness was clearly established."
As previously noted, the dealership dismissed all of its claims under the Dealer Act. The dealership's wantonness claim is based on a theory that GM breached a duty arising out of the Dealer Act. The dealership does not argue that GM had a duty of common law or constitutional origin to treat all of its dealerships the same insofar as the Auction Program was concerned. By dismissing its claims under the Dealer Act, the dealership foreclosed any finding by the jury that GM had wantonly violated that Act. The wantonness claim against GM should not have been submitted to the jury.
 IV. Bell's Individual Claims Against GM and GMAC
GM and GMAC contend that they were each entitled to a judgment as a matter of law on Bell's individual claims for damages for emotional distress. They argue that the damage or harm for which Bell sought recovery was merely incidental to his status as the sole stockholder of the dealership and, therefore, that his claims were derivative ones that had to be brought on behalf of the corporation. GM and GMAC further point out that the primary allegations of the complaint dealt with perceived wrongs to the dealership and that Bell voluntarily dismissed his personal claims based on the tort of outrage. Bell contends that his claims for damages for emotional distress were not incidental to his stockholder status. He argues, instead, that his damages claims were cognizable under his misrepresentation, suppression, and wantonness theories.
After carefully examining the record, particularly the complaint, we must agree with GM and GMAC that they were each entitled to either a directed verdict or a judgment notwithstanding the verdict with respect to Bell's individual claims for damages. As GM and GMAC point out, it is well settled that when the harm or damage for which a plaintiff seeks recovery are incidental to his or her status as a stockholder in a corporation, the claim is a derivative one and must be brought on behalf of the corporation. Pegram v.Hebding, 667 So.2d 696 (Ala. 1995). In the present case, the thrust of the complaint was that GM and GMAC had acted either intentionally (fraudulently) or wantonly to drive the dealership out of business. Thus, the primary nature of the harm or damage for which Bell sought to recover from GM and GMAC arose out of the alleged loss of dealership funds. SeeMcLaughlin v. Pannell Kerr Forster, 589 So.2d 143 (Ala. 1991). Any emotional distress suffered by Bell would logically have been caused by such a loss of funding and the resulting demise of the dealership. We must conclude, therefore, that the trial court erred in submitting Bell's personal damages claims to the jury. *Page 291 
 V. Summary of Our Holdings
Based on the above, we hold that GMAC was entitled to a judgment as a matter of law with respect to Bell's personal claim for damages for mental distress and with respect to the dealership's fraud and wantonness claims arising out of GMAC's purchase of the dealership's retail paper. We also hold that GMAC was entitled to a judgment as a matter of law with respect to the dealership's wantonness claim arising out of the repossession chargeback plan under which the dealership operated for most of its existence. However, we hold that the dealership's evidence was sufficient with respect to its misrepresentation and suppression claims against GMAC arising out of the repossession chargeback plan and, therefore, that the dealership may present these claims to another jury in another trial. Aspinwall v. Gowens,405 So.2d 134 (Ala. 1981). Likewise, we hold that GM was entitled to a judgment as a matter of law with respect to Bell's personal claim for damages for mental distress, and with respect to the dealership's fraud and wantonness claims arising out of GM's handling of its auctions. Because of our resolution of the dealership's claims against GMAC and GM, we pretermit any discussion of the new trial issues raised by GMAC and GM (most importantly, their contention that they were entitled to a new trial because of the trial court's refusal to instruct the jury that it was not to consider the dealership's claims under the Dealer Act). Because the dealership has apparently chosen not to pursue any claims that it might have under the Dealer Act, this issue is not likely to arise again on retrial.
1950506 — REVERSED AND REMANDED.
1950508 — DISMISSED.
MADDOX, J., concurs.
ALMON and SHORES, JJ., concur in the result.
HOOPER, C.J., concurs in part and dissents in part.
BUTTS, J., dissents.
[1] The plaintiffs' cross appeal, which was filed on December 20, 1995, challenged the application to them of this Court's initial decision in Life Insurance Co. of Georgia v. Johnson, (Ms. 1940357, November 17, 1995), wherein we authorized the State to share in punitive damages awards. However, on April 26, 1996, this Court, on application for rehearing, withdrew its initial opinion in Johnson and held that the State could share in punitive damages awards only in future cases involving the new bifurcated procedure. Because of the prospective nature of Johnson, the issue presented on the cross appeal is moot. See Life Insurance Co. of Georgia v. Johnson,684 So.2d 685 (Ala. 1996).
[2] GM provided the dealership with "FACTS" reports, comparing this dealership's operations with those of certain other GM dealerships. GM also provided training programs for the dealership's mechanics and sales employees. Field representatives from each of GM's divisions visited the dealership and made certain recommendations. Because Bell is African-American, representatives of GM's Minority Dealer Development Department visited the dealership regularly. This department's purpose was to develop ways to assist minority dealers. GM also provided "PEP" (Profit Enhancement Program) reports, comparing the dealership's operations to those of other dealers nationally that were owned by racial minorities. In 1985, GMAC's control branch manager, Bennett Hall, approved Bell's application for a $350,000 loan to build a new dealership facility. Hall also approved a $150,000 equipment loan for the dealership. GMAC steadily increased the dealership's limit for floor plan financing from $400,000 initially to $2,300,000 by the end of 1989. Bell requested, and received, all six lines of GM vehicles — Pontiac, Buick, Cadillac, GMC Truck, Oldsmobile, and Chevrolet. The dealership was only one of a handful in the country allowed to carry all six lines of GM vehicles. Assistant control branch manager Gregory Bemister reviewed the dealership's financial statements on a quarterly basis and talked with Bell regularly. When the dealership's inventory became too large, GM arranged to transfer some of the dealership's vehicles to other dealers. Removing these vehicles from inventory reduced the finance charges that the dealership had to pay GMAC. In addition, under a "supplemental floor plan protection" program, GM paid GMAC part of the finance charges that were owed by the dealership on its vehicles. GMAC also allowed the dealership to participate in a "Wholesale Incentive Plan" that only seven or eight other branch dealers enjoyed. Under that plan, GMAC provided a rebate to the dealership in an amount up to one percent of the dealership's wholesale finance charges. In the early 1990s, when the dealership was getting progressively weaker financially, GM and GMAC arranged financing for sales to the City of Tuskegee; provided the dealership with a special demonstrator program for Alabama State University; bought back parts in an attempt to reduce the dealership's debt; and, by "special initiatives," processed stale claims for warranty work.
[3] We note that the dealership stated on page 134 of its brief that "[i]t is of only passing interest that Mr. Hall alsomisrepresented to Bell that his dealership chargeback program 'was the same as the by-pass dealers' (R. T. 1446-47) during 1990." (Emphasis in original.) However, that portion of the record cited by the dealership does not indicate that Hall made such a representation in 1990. The pertinent portion of Bell's testimony at pages 1446-47 is as follows:
 "Q. Mr. Bell, you were asked some questions I believe by Mr. Joseph yesterday about the early or the initial repossession plan that you were under in 1981 I believe it was. Do you remember that?
"A. Yes, sir.
 "Q. And he asked you a series of questions about that and your communications with Mr. Hall connected with that. Let me ask you something — we can locate the document if necessary — do you recall there being anything on the document itself that had the words 'Modification C'?
"A. No, sir.
 "Q. Of course, the document will be or is in evidence. Let me ask you to tell the jury, Mr. Bell, whether or not Mr. Hall or Mr. Pratt ever told you that your program was different from the bypass dealers?
"A. Never in my life.
 "Q. Did he tell you that your repossession program was the same as the bypass dealers?
"A. I was always told that my program was the same.
 "Q. What, if anything, did Mr. Hall tell you about your repossession program as compared to the bypass dealers?
 "A. That my program was the same as the bypass dealers."
[4] The dealership argues as follows in its brief:
 "For damage calculation purposes, it made absolutely no difference what were 'the chargeback terms [for] the by-pass dealers before 1990,' even though appellants pretend to assert otherwise. The focus was not when (or if) the by-pass dealers went on, or they came off of, Modification 'C.' The issue was what damage did the program inflict upon Bell Motor Company after it was told it had the same benefits under GMAC's repossession chargeback plan as every other dealership located [within] the Montgomery Control Branch?"
(Emphasis original.)
[5] The dealership argues as follows in its brief:
 "[H]ad the term 'modification' been used, Mr. Bell would have asked the next logical question: 'Modification of what?' Upon doing so, naturally, he would have learned the true facts."
(Emphasis original.)
[6] We do not mean to suggest that Edrington was, initially, under a legal duty to disclose confidential information to Bell in response to Bell's inquiries concerning the chargeback plan under which the Montgomery bypass dealerships operated. However, because of Edrington's affirmative misrepresentations with respect to the chargeback plan, we conclude that GMAC was estopped to raise confidentiality as a defense to the dealership's suppression claim.
We further note that there is at least a question as to whether GMAC was statutorily prohibited from disclosing to the dealership that any specific dealership in Montgomery was on an unmodified nonrecourse chargeback plan. See § 8-20-4, part of the Dealer Act, which provides:
 "Notwithstanding the terms, provisions, or conditions of any dealer agreement or franchise or the terms or provisions of any waiver, prior to the termination, cancellation, or non-renewal of any dealer agreement or franchise, the following acts or conduct shall constitute unfair and deceptive trade practices:
". . . .
"(3) For any manufacturer . . .
 "r. To release to any outside party, except under subpoena, or as otherwise required by law or in an administrative, judicial, or arbitration proceeding, any business, financial, or personal information which may be from time to time provided by the dealer to the manufacturer, without the express written consent of the dealer."
"Manufacturer" is defined in § 8-20-3(8) as "[a]ny person engaged in the manufacturing or assembling of new motor vehicles as a regular business or any person who is controlledby the manufacturer." (Emphasis added.) A corporation is a "person" within the meaning of the Dealer Act. § 8-20-4(12). However, because this issue was not ruled on by the trial court, we do not address whether GM has any "control" over GMAC's financing decisions with respect to GM dealerships that would bring GMAC within the provisions of the Dealer Act.
[7] We note that Bell testified that during "good years" in the mid-1980s when he made "good money," GMAC had bought more than 95% of the retail paper the dealership had sent to it. We also note that the dealership made a profit in 1986 and 1987, two of the years included in Carter's analysis. Regardless of whether Bell intended to include these years in connection with his testimony that GMAC had purchased 95% of the dealership's retail paper, we must, in accordance with our standard of review, view the evidence in the light most favorable to the dealership and accept Carter's figures with respect to 1986 and 1987 as correct.
[8] In fact, one of the primary bases of the dealership's claim was that GMAC's representatives had misrepresented the fact that GMAC employees actually had the discretion to override an unfavorable MAPS score.
[9] Gregory Bemister explained as follows as to how this could occur:
 "Q. There's also been some discussion about MAPS odds. Can you tell us what MAPS odds are?
 "A. Yes. Odds are the probability that the system calculates that an application or a particular deal will be able to pay through to the end of the contract term.
 "Q. Does the deal that the customer receives at the dealership or gets at the dealership have anything to do with odds?
"A. It could be affected by it, yes.
 "Q. Would the same customer ever get turned down at one dealership and get approved at another dealership? Could that occur?
"A. Yes, that can happen.
"Q. How can that happen?
 "A. Well, again, it would depend upon the information between the two applications. The best example I could give is if somebody went into a dealership that was advertising low down payment, no credit needed. And, if the sales person at the dealership maybe only took the customer's name, address, social security number, and had part of their income that they made, then that could be evaluated under one set of circumstances. The other thing that could affect the first transaction would be the amount of down payment. Maybe that first dealer wouldn't necessarily ask for enough down payment. If that customer then went to another dealership, they may take a more completed application, getting all the customer's credit references, making sure that we have all the customer's income, and they could see that the customer put more money down.
 "Q. This morning we used an example about what would occur if a dealer charged $500 more for a car than another dealer, and the dealer who did not charge that excessive amount, that $500, also — the other one asked for $200 down payment. Would that have any particular odds or the risk part of it?
 "A. Sure. It would improve the equity of the deal which would make the deal more favorable."
[10] Program vehicles are essentially late model, low mileage, used vehicles.
[11] The record indicates that GM objected to the involvement of Bob Lee Alphin, a Georgia used car dealer, in the dealership's purchase of program vehicles for direct resale to a rental car company. Bell testified that he thought he was in compliance with the auction rules.
[12] GM states in its brief that it has approximately 9,000 dealerships.
[13] The record indicates that Lowe had also had his auction privileges suspended on a previous occasion for not properly disposing of program vehicles in accordance with the auction rules.